**Ex Parte José Noey MARTINEZ, Applicant.**

No. AP–75086.

Court of Criminal Appeals of Texas.

June 28, 2006.

Alexander L. Calhoun, Austin, for appellant.

**715**

Theodore C. Hake, Asst. Crim. Dist. Atty., Edinburg, Matthew Paul, State's Attorney, Austin, for the State.

### *OPINION*

HOLCOMB, J., delivered the opinion of the Court, in which KELLER, P.J., MEYERS, PRICE, and COCHRAN, JJ., joined.

In 1996, applicant José Noey Martinez was convicted of capital murder and sentenced to death. On direct appeal, we affirmed the conviction and sentence. *Martinez v. State*, No. AP–72,704 (Tex. Crim.App.1999) (not designated for publication). In 1999, applicant filed a writ of habeas corpus, claiming, *inter alia*, that he received ineffective assistance of counsel at the punishment phase of trial because (1) "trial counsel failed to investigate and present a statutorily recognized mitigating defense of temporary insanity resulting from drug intoxication," and (2), "trial counsel failed to conduct an adequate investigation of mitigating evidence in the form of physical, emotional, and sexual abuse and neglect in applicant's background." We ordered these claims filed and set.

*Procedural Background*

The convicting court issued an order designating the following issues, i.e., whether trial counsel:

 a. were ineffective at the punishment phase of Applicant's trial for allegedly failing to investigate and present a mitigating defense of temporary insanity resulting from drug intoxication;

 b. were ineffective for allegedly failing to investigate and present evidence that Applicant's use of rohypnol, and possibly alcohol, cocaine, and marihuana, on the evening in question had affected his mental condition at the time of the offense;

 c. were ineffective for allegedly failing to investigate and present evidence in support of a claim that the amount of rohypnol ingested by Applicant on the night in question caused him to not understand or appreciate the wrongfulness of the conduct at the time he committed the offense;

 d. were ineffective for allegedly failing to investigate and present evidence in support of an argument that Applicant had been intoxicated on rohypnol at the time he committed this capital murder and that this should be a factor which mitigated against imposition of a death sentence;

 e. were ineffective for allegedly failing to investigate and present evidence in support of a claim that Applicant had suffered heightened aggressive tendencies, or a rage reaction, from taking rohypnol on the night in question;

 f. were ineffective for allegedly failing to develop evidence concerning, and question the witnesses about, the extent of Applicant's intoxication on the night in question;

 g. were ineffective at the punishment phase of the trial for allegedly failing to conduct an adequate investigation of mitigating evidence in the form of physical, emotional, and sexual abuse and neglect in Applicant's background;

 h. were ineffective for allegedly failing to conduct sufficient investigation and locate evidence allegedly showing that Applicant and his brother had been sexually abused as children;

 i. were ineffective for allegedly ... locating and presenting only a small part of the available evidence about his family background and circumstances which had allegedly been available;

 j. were ineffective, in particular, for [ ] locating and presenting only a small part of the alleged evidence that Appli-

cant had been the victim of severe physical and emotional abuse and neglect, as well as possible sexual abuse by his father and mother;

k. were ineffective for allegedly not contacting the witnesses who could have testified about these matters or not asking them the appropriate questions to discover this information;

l. were ineffective for allegedly not utilizing these witnesses, who were allegedly available and willing to testify on Applicant's behalf;

m. were ineffective for allegedly not discovering or presenting evidence that Applicant and his brother Brian had been physically beaten and suffered emotional abuse from their step-grandfather; that the Harris County Child Protective Services had been involved with the family for several years; and that his mother had also beaten him and his brother and been verbally abusive[;]

n. were ineffective for allegedly not doing anything to substantiate the extent of the abuse; for not presenting any testimony by relatives who had personally observed the abuse; and for conducting an investigation, and presenting a case, which did not uncover or present any evidence of the abuse which Applicant's mother allegedly inflicted on Applicant and his brothers or present any evidence of any alleged sexual abuse at all.

In order to resolve these issues, trial counsel, Roberto Flores and Fela Olivarez, were ordered to file affidavits. After considerable delay, the affidavits were ultimately filed in 2003. Thereafter, the convicting court entered findings of fact and conclusions of law and recommended denying relief. Upon our review of the writ and the convicting court's order, we were not satisfied that the affidavits of counsel were adequate to resolve the factual issues, and we ordered a second evidentiary hearing on applicant's Sixth Amendment claims. The convicting court heard live testimony from applicant's trial attorneys and considered additional affidavits from some of applicant's family members and an investigator. The convicting court entered supplemental findings of fact and conclusions of law and again recommended denying relief. Based on the affidavits filed by trial counsel, all the affidavits in support of and in response to the writ, the evidence presented at the live hearing, and the evidence presented at the trial proper, we conclude that trial counsel did not render ineffective assistance and deny the relief sought.

*The Trial Proper*

The evidence at trial showed that in the early morning hours of February 19, 1995, applicant broke into the home of Esperanza Palomo with intent to steal a TV and some stereo equipment. Esperanza, who was 68 years old at the time of the offense, was babysitting her blind five-year-old granddaughter, Amanda, while Amanda's parents went out.

Earlier in the day, Amanda and her parents, Oscar and Patricia Palomo, visited and had lunch with Esperanza in her home. Later that evening, Oscar and Patricia went out for a night of dancing. When Amanda's parents returned to Esperanza's house, they knocked on the door, but no one answered. Oscar entered through a side window and discovered his mother's and daughter's bodies.

Both Esperanza and Amanda were lying in pools of blood and had been stabbed multiple times with a knife. Esperanza had been raped. Esperanza's night clothes were pushed up around her neck, and her underwear had been removed. Amanda had been wearing underwear, but

they also had been removed.[1] In vain, the hysterical couple administered CPR to Amanda and called 911.

Not more than one hour after the murders, applicant told several of his friends, including his cousin Roberto Galvan, that he had killed two people. He repeatedly said to them, "I killed her; I can't believe I killed them." Another acquaintance, Michelle Foley, who saw applicant after the murders, testified that applicant said he could not believe he had killed two people and that he wanted to go back and get the knife he left at the crime scene. Then, on his way to his father's house, applicant encountered his paternal aunt, Lisa Martinez, and told her that he had killed two people. When applicant arrived at his father's house, he told his father and his father's girlfriend that he had robbed and murdered two people. Applicant's father called police after applicant discarded the bloody clothing he was wearing and said that he was going to return to the scene of the murders to dispose of evidence and retrieve his knife. Applicant was apprehended on his way back to Esperanza's home. Once arrested, and while en route to the sheriff's department, applicant indicated that he wanted to confess to the murders, saying that he "really f___d up this time" and "want[ed] to tell [the officer] everything. . . ." Applicant later made oral and written statements to police, confessing to both murders. Blood, hair, and semen samples identified applicant as the perpetrator. Police recovered several pieces of jewelry and a telephone identified as Esperanza's from applicant; Applicant's fingerprint was found on the telephone.

In his written confession, which was admitted before the jury, applicant provided details of the offense. Applicant stated that he was at his grandparents' house before committing the offense. He explained that Esperanza's house was located across the street, and he went there with the intent to rob her. Applicant broke in through the front door by cutting through the outer screen door, unlatching it, and shoving open the front door with his shoulder. Once inside, he explained, Esperanza came toward him swinging a baseball bat. Applicant stabbed her, and she fell to the floor immediately.[2] Applicant then "got on top of her," "pulled up her gown" "past her breast," and "began to rape her." Applicant stated that, initially, Esperanza "wasn't fighting me because we have been seeing each other for a while"; that he had "been with her earlier that afternoon about 2:00 p.m."; that "[e]verytime I would go to her house, she wanted me to make love to her"; and that "[s]he is the type of lady that goes to bars and sleeps around with a lot of men." Applicant said he stabbed Esperanza several times. After killing and raping Esperanza, applicant heard Amanda "yelling and crying" from the bedroom. He then went into her room and

> climbed on top of her. I hit her once in the face and I thought she had fallen asleep. I then began to play with myself on top of the little girl. I played with myself until I came on top of the girl. I think I came on her stomach or on her blouse. After I came she began crying then I stabbed her several times. I didn't want to stab her but I did because she kept crying. After I

---

1. Amanda's night clothes were pushed up around her waist. Her mother, Patricia, testified that she could not recall if she had disturbed Amanda's clothing while attempting to resuscitate her.

2. The evidence showed that Esperanza had been stabbed multiple times, but one wound cut through her aorta. Esperanza likely died within thirty seconds of receiving this wound.

stabbed her I got my clothes, zipped up and left the house through the front door.

Applicant also stated in his confession that he had not been drinking or using drugs before he committed the offense.

*The Writ Proceedings*

As noted, appointed trial attorneys, Ricardo Flores and Fela Olivarez, filed affidavits in response to the issues designated by the trial court. While some of the averments were too conclusory to assist in our decision, the following portions of counsels' affidavits, in summary form, contributed to our resolution of applicant's Sixth Amendment claims.

Both Flores and Olivarez stated that they met with applicant several times before trial, and they spent many hours during those meetings reviewing the voluminous inculpating evidence with applicant.

Flores averred that he conferred with applicant's paternal relatives who live in Hidalgo County, but their testimony, in Flores' belief, would have benefitted only the State.[3] Flores made three trips to Houston to confer with applicant's mother, step-father, and siblings. They were "unavailable" for the third scheduled meeting, and during the first two meetings, the family members were "not very forthcoming with information about Mr. Martinez and his childhood"; the conferences were "inconveniences" to applicant's mother and stepfather; "they remained aloof; they were not interested in testifying at trial; but that they would agree to do so if really necessary." Flores stated that, "all [applicant's family members] refused to appear as witnesses," but, at the last minute, Olivarez was able to convince applicant's mother (Alma Martinez) and brother, Bri-

an, to testify at punishment. Flores noted that the applicant's mother's punishment testimony was far more harmful than helpful.

Flores stated in his affidavit that he hired Dr. A.J. Alamia, Jr., Ph.D., "to assist in developing questions, issues, and insight concerning [applicant's] mental state at all times germain [sic] to the case." Specifically, Flores stated that Dr. Alamia "provided direction, research and insight into the substance abuse issues raised in the case," and he questioned witnesses on the use, abuse, and effects of Rohypnol and assisted in developing those issues for trial.

After considerable delay, Dr. Alamia filed an affidavit in response to the convicting court's order. Much of his affidavit was too conclusory to be of much assistance in the resolution of the fact issues relating to applicant's Sixth Amendment claims. However, Dr. Alamia averred, importantly, that when conducting "a developmental history and assessment for abuse ... [t]he results yielded no indication that [applicant] had been abused and he also denied any history of sexual or physical abuse." Dr. Alamia further averred that he "followed up" on these questions with applicant's family, and accordingly, Dr. Alamia concluded that "there was no data to substantiate that [applicant] had been abused." After conducting several clinical tests, Dr. Alamia concluded that applicant's "thought process was coherent, logical and relevant; that applicant had not had any delusions or hallucinations; that applicant's cognitive function had been found to be alert; that applicant had been oriented to person, place, time and situation; and that applicant had not been in-

---

**3.** In fact, José Angel Martinez, III, applicant's father, Lisa Martinez, applicant's paternal aunt, and Lisa De Le Rosa, applicant's fa-

ther's girlfriend, who live in Hidalgo County, testified for the State during the guilt phase of trial.

sane at the time he committed this capital murder."

Pursuant to our second remand, the convicting court held a hearing, at which trial counsel Flores and Olivarez both testified. Olivarez testified that she was "second chair" counsel in applicant's case, and she had been licensed for two years by the time of trial. In accordance with "lead counsel" Flores's wishes, Olivarez's role in the case was to take notes during witness interviews and at trial. Olivarez recalled that Flores took at least three trips to Houston to interview applicant's family, but she did not accompany him on any of those visits.

The only mitigation evidence Olivarez remembers reviewing was an expert report prepared by Dr. Alamia.[4] Olivarez did not remember whether intoxication was a potential mitigation issue and did not do any research on the effects of Rohypnol. Olivarez could not recall if lead counsel ever discussed his defensive theories of the case with her.

Olivarez testified that she reviewed applicant's school records, but she could not recall any details from that review, and in particular, Olivarez could not recall the names Ray Highfield or Erma Mitchell, both of whom served as separate guardians to applicant in 1990.[5] In summary, Olivarez did not interview witnesses, nor did she play any significant role in the trial itself.

Flores had been licensed for nearly twenty years at the time of trial and had represented three other capital defendants to jury verdict. He acknowledged that Olivarez's participation in the trial was "a learning aspect," although he noted that Olivarez convinced applicant's mother, who had been reluctant to assist applicant throughout the proceedings, to testify during the punishment phase of trial.

Flores further averred that he interviewed applicant's mother and stepfather but that they were "not very forthcoming with information about [applicant] and his childhood." Applicant's mother refused to testify until convinced to do so by the pleas of Olivarez. Flores also stated that efforts were made to obtain school records pertaining to applicant's childhood but "few such records could be obtained." He stated that information was not readily available from "any source that was contacted about [applicant's] care takers" and that applicant's family members were not cooperative.

When asked what his defensive theories were at punishment, Flores testified that applicant's young age was an issue, as well as his diminished capacity at the time of the offense. Flores testified, however, that he did not believe applicant was entitled to a mitigation defense based on diminished capacity because the intoxication did not cause applicant to suffer from "memory wipe," noting that applicant recalled the details of the crime and sought to recover evidence, particularly the knife. Flores also noted applicant's possible emotional problems and family background problems, but stated that "there was not a lot of information on that."

Flores testified that he met with applicant's mother and stepfather in Houston at least twice, and that his investigator, Xavi-

---

4. Both Flores and Dr. Alamia stated that Dr. Alamia did not provide a written consultation.

5. The school records indicate that applicant lived in the home of Rev. Highfield during the earlier part of 1990 because applicant's mother had abandoned him and the whereabouts of his father were unknown. The records further reflect that applicant lived with another guardian, Ms. Erma Mitchell, in the later part of 1990 because applicant's mother "did not want him to live with her."

er Guerra, confirmed this. However, Flores could only recall details from the first of those meetings. Flores told the family what applicant had been charged with, informed them about other matters "of public record" related to the case, and obtained some general information. At the conclusion of the meeting, Flores was introduced briefly to some of applicant's brothers, but Flores did not question them. Flores could not locate the notes he took during this Houston interview.

After this initial meeting, Flores attempted to set up subsequent meetings with applicant's family while Flores was in Houston on other matters, but each time he telephoned them, they declined to participate, saying that they had to go shopping or that they were not going to be home when Flores was able to meet with them. When asked whether applicant's family in Houston was uncooperative, Flores stated "Well, all I can tell you is, we could not connect. I never was told, go away, don't bother us, leave us alone, except when we wanted mom [to testify]."

Flores stated that he met with a number of applicant's paternal relatives "in the Valley," including a cousin, an aunt, and "some other relatives," but he could not remember any of their names and could not find his notes from those meetings. Flores said he met with these relatives as a group in a conference room. Flores also met a few times briefly with applicant's father and girlfriend. Applicant's father, José Angel Martinez, III, could not provide much background information on applicant's childhood because Martinez had been in prison out of state most of that time. Applicant had lived with his father for less than a year preceding the offense.

Flores stated that sexual abuse was something he and Olivarez "considered and

discussed and were concerned about, but . . . had no information about." To investigate the possibility of sexual abuse before testifying, Flores stated that he specifically questioned applicant about it, but he did not admit to any sexual abuse. Flores testified that he asked Dr. Alamia to ask applicant about possible sexual abuse, but applicant did not divulge any information about sexual (or physical) abuse to Dr. Alamia, either. Further, Flores testified that he asked applicant's father about possible sexual abuse, but he was not aware of any such history. Flores testified that he did not remember asking applicant's brother, Brian Martinez, about any possible sexual abuse. Flores spoke only briefly with Brian just prior to his testimony during the punishment phase of trial. Flores recalled asking Brian about "any sorts of problems he and applicant had encountered in their childhood." But, while Brian informed Flores of the physical abuse, he said nothing about any sexual abuse. Flores stated that he never had the opportunity to question applicant's mother about sexual abuse. He stated that the only preparation for her testimony was meeting with her briefly in the hallway before her testimony.

Flores testified that while he was in Houston, Flores telephoned applicant's stepbrother, Bjorn Mancias, two or three times and tried to arrange a meeting, but Mancias was never able to meet.

Flores asked applicant to provide him with a list of relatives who would be able to assist in the investigation of applicant's background. Flores' investigator, Guerra, was directed to contact all the relatives on the list provided by applicant, but Flores did not recall whether Guerra had been able to actually reach anyone.[6] Flores

6. Although Flores could not specifically recall speaking with Elda Reyes, applicant's mater-

nal aunt, she states in her affidavit that Flores

stated that Guerra obtained some of applicant's school records and that these were the only records Flores had pertaining to applicant prior to trial.

Flores testified that he did not interview any of applicant's teachers or counselors, nor did Flores interview applicant's maternal grandmother, with whom applicant had lived for five years during the time applicant's mother had abandoned him and his brother Brian.

## I. Standard of Review

 A defendant claiming ineffective assistance of counsel under the Sixth Amendment to the United States Constitution must demonstrate that (1) counsel's conduct "fell below an objective standard of reasonableness," and (2) this incompetence caused the defendant prejudice. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). When assessing the reasonableness of an attorney's investigation, a reviewing court must consider the quantum of evidence already known to counsel and whether the known evidence would lead a reasonable attorney to investigate further. *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. [A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 522–23, 123 S.Ct. 2527 (quoting *Strickland*, 466 U.S. at 690–91, 104 S.Ct. 2052).

**II. Was counsel constitutionally ineffective for failing to investigate and present a temporary insanity defense based on voluntary intoxication?**

██ At trial, the testimony varied on how much mind-altering substances applicant ingested prior to the murders.[7] A wide range of evidence, admitted from various witnesses, tended to show that applicant had consumed from one to eight doses of Rohypnol, and possibly also drank alcohol, smoked marihuana, and used cocaine. Rohypnol is a strong psychoactive drug, and witnesses testified that applicant appeared to be "incoherent," "high," "tripping," "freaking out," and that he "looked crazy" after the murders. But in his confession to police, applicant denied using drugs or alcohol on the night of the murders.

In support of his argument that counsel was ineffective for failing to investigate and present a mitigation case based on temporary insanity, applicant includes, as an exhibit to his writ application, a statement from J. Thomas Payte, M.D. Dr. Payte concluded that:

a defense based upon temporary insanity due to drug intoxication would have been viable given the substance with which [sic] Mr. Martinez had taken. Further, this defense theory would not have been novel. Rohypnol is a relatively powerful tranquilizer, more powerful than Valium, and there is evidence to suggest that Mr. Martinez had taken up to ten (10) tablets that evening. As the level of intoxication increases, the intoxicated persons's [sic] cognitive understanding and appreciation of right and wrong lessens. The greater the intoxication, the more the line begins to blur and a person is less likely to understand or appreciate the nature of his conduct. It is, therefore, quite conceivable that Mr. Martinez was intoxicated to the ex-

telephoned her several times prior to trial, presumably to obtain information.

**7.** Applicant did not testify during the guilt phase or the punishment phase of trial.

tent that he could not have appreciated the rightfulness or wrongfulness of his conduct on the evening in question. The fact that Rohypnol use and abuse has been associated with black outs [sic] and memory lapses further lends support to the theory that a person intoxicated through the use of the drug might not have understood that [sic] the nature of his conduct.

Applicant further complains that, despite the information of applicant's intoxication, counsel did not request the appointment of "a pharmacologist or any other medical or scientifically trained individual to advise him."

■ Evidence of voluntary intoxication may serve to mitigate the severity of an offense where the effect of the intoxication is to render the defendant temporarily insane. Tex. Pen.Code Ann. § 8.04(b) (Vernon 2005). To be entitled to the mitigating instruction based on voluntary intoxication, it must be shown that the convicted person was unable to understand the wrongfulness of his conduct. Because the evidence at the guilt phase of trial shows that applicant was well aware that his conduct was wrong, we conclude that counsel was not deficient for failing to present a mitigation case based on temporary insanity. See id.

Trial counsel were not ineffective for failing to request an instruction on tempo-

rary insanity because applicant stated in his confession that he had not been using drugs or alcohol, he immediately confessed to the crime, he repeatedly told his friends that he could not believe he had committed the murders, and he told the arresting officer that he had "really f___ed up this time." All of this evidence establishes that applicant was indeed aware of the wrongfulness of his conduct; thus, a mitigation instruction would not have been supported by the evidence. See Mendenhall v. State, 77 S.W.3d 815, 817–18 (Tex.Crim.App. 2002) (it is an affirmative defense to prosecution that, at the time of the alleged offense, the defendant, as a result of a severe mental defect caused by involuntary intoxication, did not know that his conduct was wrong).

What is more, Galvan, who saw applicant approximately one hour before and one hour after the offense, described applicant's behavior as heavily intoxicated, but he did not describe applicant as incoherent, psychotic, or enraged.[8] Nevertheless, applicant further suggests, according to Dr. Payte's affidavit, that counsel was ineffective because Rohypnol is known to cause out-of-character behavior; i.e., "Mr. Martinez's Rohypnol use may have been a contributing factor to, or an explanation of his conduct." Specifically, Dr. Payte opined that, given applicant's non-violent past and the violent nature of the offense, a mitigation defense of temporary insanity

8. Applicant attaches an exhibit to his writ which provides a compilation of Rohypnol case scenarios. The writ evidence documents some rare effects of Rohypnol abuse, including confusion, disorientation, and the inability to remember the things the actor did during the violent or psychotic episode. Based on the evidence adduced at the guilt phase, however, there was little, if any, such evidence admitted through the State's witnesses. So, even if we were to entertain the theory which applicant now advances, i.e., that trial counsel were ineffective for failing to pursue an

insanity defense because he may have been experiencing violent effects of Rohypnol abuse, the writ evidence he sets forth in support of this claim does not meet the test necessary to receive the instruction. That is, the case scenarios describe violent behavior while under the influence of excessive doses of Rohypnol, but none of the subjects could later recall the violent actions they took. Here, the trial testimony shows that applicant had a vivid recollection of the events, and even sought to return to the crime scene and retrieve his knife.

should have been pursued because, although rare, Rohypnol can cause "behavior disinhibition, rage, aggression, suicidality, amnestic reactions, and cognitive disturbances" and "[t]he known potential effects of these drugs suggest the possibility of a role of drug induced disinhibition with associated rage and aggression as a contributory factor in the commission of acts of extreme violence which occurred in this case."

Although it may be true that Rohypnol abuse, while rare, *may possibly* cause violent behavior in otherwise non-violent users, the trial record reflects that even when applicant was not taking Rohypnol, his behavior was hardly non-violent. For example, at the punishment phase of trial, the jury heard evidence that, while awaiting trial, applicant and another inmate wrote a letter to then President Clinton, threatening to kill him and rape his wife and daughter. In the letter, applicant also threatened the life of then Vice President Al Gore. A secret service agent who investigated the threats testified at the punishment phase of applicant's trial, saying that he asked applicant about the threat and that applicant admitted to writing the letter and reaffirmed his desire to carry out the threats. Because he was incarcerated in the county jail on these two occasions, we may assume that applicant had not taken Rohypnol, yet he clearly exhibited a violent nature.

Even if Rohypnol can cause psychosis or rage reaction, these affects would not support a mitigation defense here because, as we explained in *Mendenhall v. State*, the test to support an intoxication defense is whether the actor was aware of the wrongfulness of his conduct. In *Mendenhall*, we stated that the defense of temporary insanity due to voluntary intoxication is not available to defendants who claim that they were unconscious or semi-conscious at the time of the alleged offense because they may argue either that they lacked the *mens rea* necessary for criminal liability, *see* TEX. PEN.CODE ANN. § 6.02(a) (Vernon 2003), or that they did not engage in a voluntary act, *see id.* § 6.01(a). *See Mendenhall*, 77 S.W.3d at 818.[9]

But even if applicant's theory were to support such an instruction, there is no indication from the evidence adduced at the guilt stage of trial that applicant was experiencing a rage reaction or psychosis when he committed the murders. Instead, what the evidence shows is that applicant broke into Esperanza's home with the intent to steal valuables. Other than applicant's statement that Esperanza threatened him with a baseball bat, there was no evidence of a struggle between applicant and Esperanza. She died almost instantly because applicant stabbed her in the neck, severing an artery. Applicant then raped her. This evidence does not suggest a rage reaction so severe that applicant could not understand the wrongfulness of his conduct. Applicant, according to his own confession, then sought out the terrified blind child who was on her bed, climbed on top of her, punched her in the face, performed a sex act on her, and then stabbed her multiple times because she was crying. None of this evidence suggests a drug-induced rage that prevented applicant from knowing what he was doing was wrong. *See Mendenhall v. State*, 77 S.W.3d at 817–18. On the contrary, there was ample evidence that applicant had a keen understanding of the wrongfulness of his conduct; therefore, he was not entitled

---

9. Although applicant did not advance the theories that counsel were ineffective for failing to pursue a defense based on lack of *mens rea* or lack of a voluntary act, the evidence at trial, particularly applicant's own statement, belies those theories.

to the instruction, even if he was in a drug-induced rage or psychosis.

At the writ hearing, Flores testified that he did not pursue an insanity mitigation defense because applicant was able to recall the details of the crime, applicant was concerned about retrieving his knife and concealing evidence, and applicant had not experienced "memory wipe." Moreover, Dr. Alamia, who advised Flores, concluded from his clinical tests, that applicant had not been insane at the time of the offense. In addition, applicant has failed to demonstrate that the drugs he voluntarily took indeed caused a psychotic reaction so debilitating that he could not understand the wrongfulness of his conduct, and thus, he was entitled to a mitigating instruction of voluntary intoxication.[10] Because the facts adduced at trial and at the writ hearings do not support the mitigation defense of temporary insanity, trial counsel were not deficient for failing to further investigate and pursue the defense. *See Sawyers v. State,* 724 S.W.2d 24 (Tex.Crim.App.1986) (evidence showing the defendant was intoxicated and nothing more does not justify submission of an issue on temporary insanity, and refusal to submit such charge in mitigation of punishment is not error); *Ex parte Lilly,* 656 S.W.2d 490, 493 (Tex.Crim.App.1983) (counsel's failure to investigate the facts of a case constitutes ineffectiveness if the result is that any *viable* defense available to the accused was not advanced). We conclude that, had counsel requested an instruction on temporary insanity as a mitigating factor, it would have been properly denied. *See Hart v. State,* 537 S.W.2d 21, 24 (Tex.Crim.App.1976) (holding that the evidence at trial showed Hart was aware that what he was doing was wrong). Similarly, because applicant

knew his behavior was wrong, a denial of a county-funded appointment of an expert would not have been trial court error. Therefore, we hold that counsel were not ineffective for failing to further develop a mitigating intoxication defense, for failing to request that an expert be appointed, or for failing to request an instruction based on temporary insanity. *See Wiggins v. Smith,* 539 U.S. at 527, 123 S.Ct. 2527. We deny relief on applicant's first claim.

## III. Did counsel render constitutionally ineffective assistance of counsel during the punishment phase of trial by failing to conduct an adequate investigation into physical, emotional, and sexual abuse?

In his second claim, applicant complains that counsel was ineffective for failing to discover and introduce evidence that applicant had suffered neglect and severe physical and sexual abuse throughout his childhood. We summarize below the evidence presented at the punishment phase of trial and the affidavits in support of the Sixth Amendment claim.

### A. *Deficient Performance*

At the punishment phase of trial, defense counsel presented two witnesses on applicant's behalf—applicant's mother, Alma Martinez, and his brother, Brian Martinez. Alma had refused to testify in applicant's behalf, but at the last minute, Olivarez convinced her to drive from Houston to Hidalgo County and testify on applicant's behalf at punishment. In addition to Brian, Alma brought her half-sister, Elda Reyes, to testify at the punishment proceedings; however, Flores chose not to call her because she smelled of alcohol.

---

10. It is noteworthy that Dr. Payte does not aver that, in his opinion, applicant was indeed suffering from the paradoxical effects of Rohypnol, but rather, he concludes it was "quite conceivable" applicant "was intoxicated to the extent that he could not have appreciated the rightfulness or wrongfulness of his conduct on the evening in question."

Alma testified that she abandoned applicant and his brother Brian shortly after divorcing their father, José Angel Martinez, III, who, she said, was physically abusive to her. Applicant was about five years old when she left, and she did not return for five years, during which time applicant and Brian lived with their maternal grandparents. Alma never saw applicant or Brian during those five years and explained that she got involved with another abusive man and married him. Alma testified that, at the direction of this husband, she committed forgery, spent some time and in jail for the offense, and ultimately received probation.[11] After divorcing this second husband, Alma returned to retrieve applicant and Brian. Thereafter, they lived together in Houston in a house next door to Alma's mother and stepfather. Alma stated that she knew her mother and stepfather had "abuse[d] my kids." Alma explained that, at the slightest provocation, her stepfather "would kick my kids, grab the belt, swing them against the wall or use his fists."

Alma testified that, after reuniting with applicant and Brian, she "had to be on welfare" because her mother "forced" her to quit her job and stay home with the kids. Alma testified that applicant would run away from home, "maybe for the things [she] had done," and on one occasion, he went to live with some members of a church group for a month or two. Alma testified that applicant's father, Angel, had no contact with applicant, except for one telephone call upon Angel's release from prison. Alma testified that, thereafter, Angel never paid any child support.

On cross-examination, the State asked Alma a series of questions about her own family and how she would feel if they had been murdered in the same way applicant had murdered Esperanza and Amanda. After this line of questioning continued for some minutes, Applicant blurted out, "Leave my mom alone, man." Alma responded immediately, "Why did you do it[,] Noey?" The jury was immediately excused, and Alma was admonished "not to address any statements to the defendant in this case." When the jury returned, the State asked one question of Alma, i.e., "Should a thief, a rapist and a killer pay for their [sic] crime?" Alma responded, "Yes." On redirect examination, Flores did not ask Alma anymore questions, and she was excused.

Trial counsel then called applicant's brother to the stand. Brian testified that living with their grandparents was "terrible" because he and applicant "always got beat." Brian testified that he still harbors "hate" for his mother for abandoning him and his brother with his abusive grandparents.

In his writ, applicant attaches affidavits of four relatives—applicant's brother Brian, an aunt, an uncle, and his step-brother Bjorn Mancias—who allege severe physical and emotional abuse by Alma, as well as evidence of sexual abuse by Alma. According to the affidavits, Alma's abuse of applicant and Brian was just as bad as their grandfather's. Alma beat the boys severely on a daily basis, and subjected them to harsh verbal assaults. She used drugs in front of them and often kicked them out of the house. Bjorn states in his affidavit that applicant's mother was an "atrocious mother" and that he is "surprised that any of the boys survived past the age of 10." Bjorn further averred that he suspected that applicant and his brothers were sexually abused by Alma. Applicant's maternal aunt, Elda Reyes, states in

---

11. Trial counsel also elicited testimony that sometime after applicant came to live with her, she was charged with auto theft and received probation.

her affidavit that Alma frequently beat applicant and was verbally abusive to him. Reyes also avers that Alma had sexually abused her and other family members. Reyes states that, had trial counsel called her to the stand, she would have testified to these facts. Applicant's uncle, Raul Guanajuato, avers in his affidavit that Alma was extremely physically and verbally abusive to applicant, and that prior to the murders, applicant had always been non-violent. Guanajuato stated that Flores never contacted him, and if he had, Guanajuato would have testified to the facts stated in his affidavit.

Applicant also attaches affidavits by Rev. Ray Highfield and his wife Earlene, with whom applicant lived for two months in 1990. The Highfields aver that applicant came to live with them because applicant's mother "refused to take him back" after church services one day. Ray Highfield stated that it was obvious applicant had been abused; that the homes the family had been living in were "small, dirty, and inadequately furnished"; that he saw a cut on applicant's hand and applicant told him that his mother had stabbed him; that applicant was "badly in need of love and attention," and that it was "obvious that he had been neglected all of his life"; that applicant always wanted hugs, which was unusual for an eleven-year-old boy; that applicant mentioned that his mother brought men into the home and slept with them in front of applicant and his brother; and that applicant was underfed and often talked about being hungry when in his mother's care. Ray Highfield averred that applicant left his home to live with Erma Mitchell, but after about a month, applicant's mother wanted him back, not because she loved him, but so that she could continue receiving food stamps. Both Ray and Earlene Highfield stated that applicant's trial counsel did not contact them, but if they had been contacted, the High-

fields would have testified in applicant's behalf at punishment.

Applicant also attaches an affidavit by an investigator with some social work training. The investigator states that she interviewed Alma, who admitted to physically abusing applicant as badly as he was abused by his grandfather. The investigator also states that Brian admitted to her that he was sexually abused as a young child by their father and later by their mother, and that Brian suspected applicant had been sexually abused as well. Finally, the investigator avers that applicant admitted to her that he had been sexually abused by Alma on a regular basis, sometimes at knife point or under other threats of violence.

■ Applicant claims that counsel's minimal investigation into his background fell below an objective standard of reasonableness, and that the deficiency was particularly notable in light of the fact that applicant's mother, who was herself a primary abuser, was the chief punishment witness on applicant's behalf. The only other witness, applicant complains, was his brother Brian, who was interviewed for the first and only time immediately before his testimony.

We hold that trial counsel's performance did not fall below an objective standard of reasonableness under prevailing professional norms. See Wiggins, 539 U.S. at 521, 123 S.Ct. 2527. We further hold that, even if "trial counsel were deficient for failing to adequately investigate and put forth all the evidence of applicant's history of abuse," applicant was not prejudiced by the alleged deficient performance. See id. at 534, 123 S.Ct. 2527 (quoting Strickland, 466 U.S. at 692, 104 S.Ct. 2052 "to establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the re-

sult of the proceeding would have been different.").

In *Wiggins v. Smith*, the United States Supreme Court granted federal habeas corpus relief based on trial counsel's failure to further investigate and put forth mitigating punishment evidence of severe physical and sexual abuse which counsel apparently knew about before trial. 539 U.S. at 515–16, 123 S.Ct. 2527. Specifically, Wiggins's trial counsel told jurors in opening statement that they would hear about his difficult life, including severe physical and sexual abuse. However, trial counsel never introduced any of that known evidence, and the jury sentenced Wiggins to death. *Wiggins*, 539 U.S. at 515, 123 S.Ct. 2527. The Supreme Court noted that trial counsel failed to extend their investigation into Wiggins's background beyond public reports and records they had obtained, despite the fact that those records clearly indicated a troubled childhood. In assessing whether counsel's performance reflected prevailing professional norms, the Supreme Court looked to the American Bar Association Guidelines, which emphasize that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available mitigating evidence* and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" *See Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527 (quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases § 11.4.1(C), p. 93 (1989)) (emphasis added). Under the test set forth in *Wiggins*, we must decide whether the actions taken by counsel in investigating applicant's background were reasonable, specifically, "whether the investigation supporting counsel's decision not to introduce mitigating evidence of [applicant's] background *was itself reasonable*." *Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527 (emphasis in original).

On the one hand, trial counsel did not discover the alleged sexual abuse, nor did he probe the punishment witnesses for details about the physical abuse and the extent of that abuse. And, neither Alma or Brian testified about the physical abuse Alma inflicted upon her sons. Additionally, Flores admitted at the live writ hearing that he did not have a social history prepared, he did not obtain CPS records that may have existed at the time, and he did not contact either of the foster parents, Highfield or Mitchell, for an interview. And, as noted, several of applicant's family members averred that, had trial counsel contacted them, or otherwise, if counsel had asked them the right questions during the interviews, they would have revealed that applicant suffered severe physical and/or sexual abuse at the hands of his mother, his maternal grandparents, and his father, and moreover, would have appeared at the punishment phase of trial and testified to the same.

On the other hand, testimony at the writ hearing established that Flores repeatedly contacted applicant's mother and stepfather in furtherance of his investigation, but they would not cooperate. At the repeated urging of Olivarez, applicant's mother, brother, and an aunt finally agreed to appear during the eleventh hour of trial. Thus, it cannot be incumbent upon trial counsel to adequately prepare witnesses, who after months of urging, decide to appear at the last moment and testify. In such circumstances, trial counsel cannot be held accountable for failing to elicit all the evidence of physical abuse and the extent of that abuse. And in any event, the jury had before it evidence of harsh physical and emotional abuse. Applicant's mother admitted to abandoning applicant for five years when he was very young and leaving him in the hands of a known physical abuser, her stepfather.

She further testified that her stepfather, at the slightest provocation, "would kick my kids, grab the belt, swing them against the wall or use his fists," which is, of course, evidence of severe and sustained physical abuse. All in all, her testimony painted a very bleak picture of applicant's childhood: his mother was poor and uneducated; she was physically abused by at least two husbands; she was involved in and convicted of at least two crimes; she heartlessly abandoned her children in the middle of the night without saying goodbye or providing an explanation; and applicant's father had been long incarcerated and did not seek to establish a relationship with them or support them after being released. Brian also testified that applicant suffered physical abuse at the hands of his grandfather, and while trial counsel could have expanded on the evidence by asking more probing follow-up questions, this failure can hardly be attributed to counsel alone, as both applicant's mother and brother refused to cooperate until after the punishment proceedings had begun.

As to the purported sexual abuse that was not revealed or discovered until after the sentence of death had been imposed, Flores testified that applicant had denied any sexual abuse during their several interviews. Dr. Alamia also averred that applicant denied any sexual abuse when questioned, and furthermore, Dr. Alamia's clinical tests reflected that applicant had not been sexually abused.[12] Flores testified that when he interviewed Brian prior to his testimony, Flores asked open-ended questions about abuse; specifically, Flores asked Brian "what sort of problems Noey

had encountered, what sort of things happened" during his childhood. However, Brian apparently did not elaborate on the extent of the abuse. Trial counsel testified that he met with and questioned several family members, and while some of them divulged physical abuse and abandonment, no one offered any evidence of sexual abuse. Notably too, none of the sexual abuse allegations by the various family members would have been admissible during the punishment phase of trial because they were based on speculation. That is, no family member averred, based on personal knowledge, that applicant had been sexually abused in any way.[13] After the outburst in the courtroom and the comments by applicant's mother, applicant chose not to testify in his own behalf at punishment. Had applicant chosen to testify in his own behalf, he would have been subject to cross-examination on matters such as his gang affiliation and his past acts of violence. Based on the evidence presented here, it appears that the only person who could have testified about any alleged sexual abuse would have been applicant himself. Thus, the failure to present evidence of the alleged sexual abuse is borne primarily by applicant, as he had ample opportunity to divulge this evidence to his lawyer and at least one of his agents before trial.

Based on the forgoing, trial counsel were not deficient under the first prong of *Strickland* because the decision not to further pursue the investigation into applicant's background was itself reasonable. *See Wiggins*, 539 U.S. at 523, 123 S.Ct. 2527. Trial counsel repeatedly sought to

---

12. Applicant's writ investigator James McKay states in his affidavit that Dr. Alamia told him that Dr. Alamia had concluded, prior to trial, that applicant had suffered sexual abuse.

13. One maternal aunt, "Frenchy" Reyes, averred in her affidavit that Alma sexually molested her by squeezing her breasts and attempting to remove her pants. Frenchy further stated that she observed Alma sexually molest her youngest son, Leonard, when he was a toddler, by manipulating his penis for several minutes.

obtain information from family members, but the family members were too busy to meet with him. Applicant did not divulge any evidence of sexual abuse until after the sentence of death was imposed. The effects of Alma's punishment testimony cannot be blamed solely on counsel because she chose to distance herself from the process until the last minute. Moreover, trial counsel employed an investigator and obtained and reviewed school records, and although more may have been done to follow up on that information, the alleged sexual abuse could not have been elicited in admissible form from those witnesses in any event. *See Wiggins,* 539 U.S. at 533, 123 S.Ct. 2527 (*"Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing."). Lastly, it was not unreasonable trial strategy, as applicant now suggests, for Flores to forgo trying to rehabilitate Alma after she shouted out, "Why did you do it, Noey?"

■ We conclude that it was not unreasonable for trial counsel to abandon further efforts to investigate the possibility of sexual abuse once applicant told counsel that he had never been sexually abused. While standing alone, this fact may be inadequate to justify abandoning further investigation, *see, e.g., Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 2460, 162 L.Ed.2d 360 (2005) (even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, counsel is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial), applicant's denial of sexual abuse was compounded by his similar denial to Dr. Alamia. Plus, the school records

obtained by counsel are unremarkable with respect to any kind of abuse. In fact, the records merely reflect abandonment by applicant's mother. And since no family members offered any allegations of sexual abuse when asked open-ended questions about the abuse applicant suffered, the evidence was not *reasonably available* before trial. *See Wiggins,* 539 U.S. at 524, 123 S.Ct. 2527. As previously noted, had these witnesses offered this information to counsel before trial, the evidence could only serve to bolster any sexual abuse allegations made by applicant himself.

As for trial counsel's alleged failure to expand on the testimony proffered by Alma and Brian regarding the physical abuse, again, applicant having thwarted Flores's efforts to obtain information until after the punishment proceedings had begun, must shoulder at least some of the blame for failing to elicit evidence. And in any event, Alma and Brian's limited testimony painted a very bleak childhood existence. With these facts in mind, and when applying the "strong presumption that counsel's performance fell within the wide range of reasonable professional assistance," and in avoiding "the distorting effect of hindsight," we hold that counsel's errors, if any, are not "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *See Strickland,* 466 U.S. at 687, 689, 104 S.Ct. 2052. That is, considering the quantum of evidence already known to counsel, including repeated denials of physical and sexual abuse by Alma, unremarkable school records, the knowledge of applicant's abandonment by Alma, and his grandfather's physical abuse, would not compel a reasonable attorney to investigate further. *See Wiggins v. Smith,* 539 U.S. at 527, 123 S.Ct. 2527; *Ex parte Woods,* 176 S.W.3d 224 (Tex.Crim.App. 2005) (denying habeas relief on *Wiggins* claim where trial counsel did investigate

by obtaining records and talking to family members and did present mitigating evidence, "albeit a minimal amount.").

## B. *Prejudice* [14]

 We further hold that, even if counsel were deficient in failing to discover and introduce evidence of sexual abuse and a more detailed picture of physical abuse, applicant was not prejudiced by the omission. As already explained, to demonstrate prejudice, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. "[T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052. To determine whether applicant was prejudiced by trial counsel's alleged deficient performance, "we reweigh the evidence in aggravation against the totality of available mitigating evidence." *See Wiggins,* 539 U.S. at 534, 123 S.Ct. 2527; *Williams v. Taylor,* 529 U.S. 362, 398, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

The mitigating evidence admitted showed that applicant had suffered harsh physical abuse by his grandfather and a long period of abandonment by his mother. He was eighteen years old at the time of the offense. He had no prior criminal record.

The evidence in aggravation of death was extensive.[15] First, the jury heard evidence that applicant planned to assassinate the President and the Vice President of the United States and rape the First Lady and Chelsea Clinton. Second, the facts of this capital murder are heinous. Applicant broke into Esperanza's home late at night, dealt a fatal stab wound to her neck, and raped her. According to applicant's statement, Amanda, the blind and defenseless five-year-old girl, heard the attack on her grandmother and started to cry. Applicant proceeded into Amanda's room, punched her in the face, ejaculated on her body, and then murdered her "because she was crying." Had the jury heard and believed the more extensive evidence of physical abuse and the alleged (but inadmissible) sexual abuse, it is unlikely that it would have had any effect on the jury's verdict. Moreover, the evidence at the guilt stage relating to Oscar and Patricia Palomo's discovery of the bodies, their reactions to the gruesome crime scene, and their testimony about their continued grief was compelling. It is notable too that, in his confession, applicant attempted to depict Esperanza as a bar-hopping, sex-crazed woman who regularly sought sexual relations with him and that she did so on the day of the murders. Such a characterization was clearly refuted by the evidence elicited from Oscar and Patricia, and the

---

**14.** Applicant does not set forth any legal or factual arguments, either in his writ or in his brief to this Court, how applicant was prejudiced by the alleged failure to present a more detailed picture regarding the physical abuse he suffered or the alleged sexual abuse. Accordingly, we would be authorized to deny relief on this failure alone. *See Strickland,* 466 U.S. at 697, 104 S.Ct. 2052 (a defendant's failure to satisfy one prong of the two-part test for ineffective assistance of counsel negates a court's need to consider the other);

*Russeau v. State,* 171 S.W.3d 871, 881 (Tex. Crim.App.2005) (declining to address appellant's confrontation claim under the Texas Constitution because appellant provided no argument or authority for such claim, citing Tex.R.App. P. 38.1(h)).

**15.** Both parties asked that the jury consider evidence from the guilt phase of trial during punishment, and the jury was so instructed.

jury's punishment verdict could be reflective of its reasoned moral response to a horrible crime (with devastating consequences), committed by a person who was willing to vilify falsely his victim.

We must decide whether the undiscovered and unoffered evidence would have created a reasonable probability that, had the jury heard it, the jury's verdict would have been different. The aggravating factors in this case were severe. The omitted mitigating evidence, if offered in admissible form and believed, was strong. *Wiggins*, 539 U.S. at 537–38, 123 S.Ct. 2527. However, since the jury was privy to some of the severe abuse applicant suffered during his childhood, there is not a reasonable probability that the unadmitted alleged mitigating evidence would have tipped the scale in applicant's favor. *See Gillard v. Mitchell*, 445 F.3d 883 (6th Cir.2006) (citing *Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527). Accordingly, we hold that even if trial counsel's punishment evidence "merely scratched the surface," as applicant suggests, the punishment evidence that was not admitted, probably would have had no effect on the jury's answer to the mitigation special issue. *See Ex parte Woods, supra* ("It is entirely reasonable to conclude that a Texas jury would be singularly unimpressed by the sordid details of applicant's background and bad character traits."); *Hill v. Mitchell*, 400 F.3d 308,

319 (6th Cir.2005) (to establish prejudice, the new evidence that a habeas petitioner presents must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing); *Johnson v. Bell*, 344 F.3d 567, 574 (6th Cir.2003). We deny relief on applicant's second Sixth Amendment claim.

WOMACK, J., concurred.

HERVEY, J., filed a concurring opinion, in which, KELLER, P.J., JOHNSON, and KEASLER, JJ., joined.

HERVEY, J., filed a concurring opinion in which KELLER, P.J., JOHNSON, and KEASLER, JJ., joined.

I concur in the court's judgment. Applicant claims that trial counsel was constitutionally ineffective [1] for not more vigorously pursuing a mitigation defense based on applicant's voluntary intoxication at the time of the offense and for inadequately investigating and not discovering non-offense-related evidence of applicant's "troubled" childhood. The constitutional claim is that this "mitigating" evidence might have, from the standpoint of at least one juror, somehow reduced applicant's moral and personal culpability for brutally murdering and sexually assaulting a 68–year–old woman and her blind, 4 1/2–year–old granddaughter.[2]

---

1. *See generally Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

2. *See Wiggins v. Smith*, 539 U.S. 510, 535, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (evidence about a defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable than defendants who have no such excuse) (internal quotes omitted) *quoting in part Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (underly-

ing Supreme Court's mitigation jurisprudence "is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, 'evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.' "); *see also Tennard v. Dretke*, 542 U.S. 274, 285, 124 S.Ct. 2562, 159 L.Ed.2d 384 (2004) (con-

Applicant's trial counsel provided testimony at the habeas hearing describing his punishment theory at applicant's trial:

Q. [APPLICANT'S HABEAS COUNSEL]: —what would—what was your punishment theory at trial? What theory of defense did you have with regards to the jury? Why should they not assess the death penalty against [applicant]?

A. [APPLICANT'S TRIAL COUNSEL]: There was an issue of his age, even though he was 18, he was still a young man. There was an issue of whether or not he was diminished to some extent because of the ingestion of some substance. There was an issue of whether or not there were psychological concerns, but not so much psychological, so much as emotional that were involved.

There were some questions that we had going in on whether or not there was some background, family background problems. We didn't have an awful lot of information about that. It just depended on what came in.

Q. Was physical abuse an issue?

A. Physical abuse was a concern. Physical abuse was something that was discussed, but we didn't really have much about?

Q. What do you mean about, not having "much about"?

A. Somebody has to be willing to tell you. You have to have a witness. You have to have something.

Q. Was sexual abuse an issue?

A. Sexual abuse was something that we considered and discussed and were concerned about, but we had no information about.

The habeas record reflects that applicant's mother did not plan to testify on applicant's behalf at the punishment phase of his capital murder trial. In the middle of applicant's trial, the mother was finally persuaded to testify by one of applicant's lawyers. The mother came to applicant's trial with one of applicant's brothers and an aunt. Trial counsel briefly met with them in the hallway outside the courtroom. Trial counsel decided not to have the aunt testify because she had alcohol on her breath, her speech was a little slurred and she "didn't really have much to say at the time."

Applicant's mother and brother testified very briefly at the punishment phase of applicant's trial. They testified that applicant's mother abandoned applicant and the brother when they were young and that they lived with their physically abusive grandparents for five years. The State does not dispute the assertion in applicant's brief that the brother's testimony "relating to his and Applicant's experiences living with their grandparents constitutes 31 words; his actual description of the conditions of abuse constitutes eight words." These were the only witnesses to testify for applicant at the punishment phase of his trial.

The habeas record reflects that habeas counsel's post-conviction investigation of applicant's background uncovered significantly more evidence than that presented at applicant's trial. This post-conviction investigation turned up new evidence of applicant's "troubled" childhood, including evidence of physical and sexual abuse by his mother, which meets *Tennard's* low threshold for constitutionally relevant mitigating evidence. *See Tennard,* 542 U.S. at

stitutionally relevant mitigating evidence is evidence that sentencer could reasonably find

warrants a sentence less than death).

285, 124 S.Ct. 2562. This new evidence is based on affidavits of three people who were not interviewed by applicant's trial counsel. This new evidence is also based on an affidavit of applicant's brother, who provided "more detailed facts about his and Applicant's upbringing" than he did when he testified at applicant's trial, and an affidavit of the aunt, who had alcohol on her breath at applicant's trial. This new evidence is also based on an affidavit by a licensed "investigator/mitigation-specialist" (Milstein). Milstein's affidavit also states that she needs more money to do a more complete and thorough report.

Applicant's trial counsel testified at the habeas hearing about his pretrial investigation of mitigating evidence on applicant's background which included an investigation of whether applicant had been physically or sexually abused. Applicant's trial counsel testified that he spoke with many but not all of applicant's relatives, none of whom mentioned anything about applicant being physically or sexually abused. Applicant's trial counsel testified that applicant's mother was very uncooperative and not forthcoming with any information of physical or sexual abuse. Applicant's trial counsel also spoke by telephone with the aunt who came to applicant's trial with alcohol on her breath. This aunt provided no information that applicant may have been physically or sexually abused. The record is not clear on whether applicant's trial counsel spoke with the brother before applicant's trial. The record supports a finding that the brother failed to mention anything about physical or sexual abuse when he spoke to applicant's trial counsel before testifying at applicant's trial.[3]

Applicant's trial counsel did not seek out the assistance of any social workers or "mitigation specialists," and he did not have anyone prepare a formal "social history" of applicant.

Q. [APPLICANT'S HABEAS COUNSEL]: Did you have any social workers assisting you?

A. [APPLICANT'S TRIAL COUNSEL]: No.

Q. Mitigation specialists? Have you ever heard of mitigation specialists?

A. Sure.

Q. Did you use anyone in this case?

A. I didn't know of mitigation specialists back then. I think that it is a new specialty that people are outdoing [sic] money now.

Q. Have you ever used—

A. No.

\* \* \*

Q. I believe you said a minute ago— well, let me ask you this. Did you or anyone at your direction prepare a social history of [applicant]?

A. A social history, no.

Q. A social history. Okay. Did you or anyone, as part of the defense team, prepare any kind of summary of the mitigating factors, of [applicant's] background, character, health, at the time of the offense?

A. A formal?

---

**3.** Contrary to the testimony of applicant's trial counsel at the habeas hearing, Milstein states in her affidavit, which relies heavily on statements by applicant, his mother, his brother and the aunt:

> We have concluded from the investigation, however, that [applicant's] trial counsel only contacted and interviewed three witnesses—[the mother], [the brother] and [the

aunt]. Of these three, only [the mother] was interviewed to a significant extent. [The brother], who testified, was never contacted prior to trial, and was only interviewed briefly right before he testified. [The aunt] was contacted a number of times by telephone, but was only interviewed interviewed [sic] to any extent the day of trial. [The aunt] did not testify at trial.

Q. Formal. Formal.

A. Formal, no, certainly not.

Applicant's trial counsel testified that applicant was not forthcoming with evidence of physical or sexual abuse either to him or to the psychologist (Alamia) appointed by the court to assist the defense. Alamia filed an affidavit in this habeas proceeding.[4] Alamia's affidavit states:

"In the matter of [applicant], I was appointed by the court to assist the trial team in assessing whether or not [applicant] was mentally retarded, competent to stand trial/not insane and whether or not there was any other presenting problem that would explain his behavior (i.e., if he had been physically/sexually abused).

With reference to this latter point, a developmental history and assessment for abuse was conducted on [applicant]. The results yielded no indication that he had been abused and he also denied any history of sexual or physical abuse; however, he did state that he abused alcohol and drugs. A follow up investigation into this matter was conducted through telephonic conference discussions with the biological mother and step father. Efforts to meet with the biological father to discuss these issues proved futile (i.e., he refused to meet with me). After having done this, it was concluded that, there was no conclusive data to substantiate that he had been abused. A clinical interview to assist in determining his mental status revealed that his thought process was coherent, logical and relevant. He had no delusions or hallucinations and his cognitive function

was found to be alert. He was also oriented to person, place, time and situation. He was not insane at the time of his act.

A Wechsler test of intellectual functioning was also administered and its results indicated that he had a fair fund of knowledge and although his scores were borderline to low average, it was commensurate with his deficient academic achievement and learning difficulties that were reported in school records that were provided and reviewed for this matter.

I was also asked to work on the jury questionnaire and to work with [applicant] and prepare him in case he was to testify on his behalf. In the latter regard we reviewed video tapes of the crime scene and discussed the various statements he had made about this incident. At no time during all of the aforementioned efforts did [applicant] show any signs of being impaired in any fashion. He was able to understand his legal situation, charges against him, facts relevant to his case, legal issues and procedures in his case as well as the legal defenses available to him. Thus, [applicant] was not found to be mentally retarded, competent to stand trial [sic]/ not insane and no evidence was found to support the fact that he had been physically/sexually abused." [5]

Applicant's trial counsel testified that applicant was not forthcoming to him with any allegations of physical or sexual abuse other than saying that his mother was "rough with him." Habeas counsel also questioned trial counsel on the difficulty

4. Evidence was presented at the habeas hearing that Alamia has a PhD. and teaches psychology at a local university. Evidence was also presented at the habeas hearing that Alamia is not licensed to practice psychology by the Texas Board of Standards and Professional Counseling and that Alamia "should not be working outside the university setting."

5. Applicant's trial counsel testified that Alamia did not provide any kind of written report.

that young males might have discussing allegations of physical and sexual abuse.

Q. [APPLICANT'S HABEAS COUNSEL]: Could I ask you a question. In your experience, you have dealt with these issues before, have you not, of dealing with sexual abuse?

A. [APPLICANT'S TRIAL COUNSEL]: Yes.

Q. Is it strange that sexual abuse has been very difficult to obtain from someone?

A. Sure.

Q. Is it also fair to say that actually with young males, perhaps the issue of sexual abuse might be somewhat shameful, and might be a little less reluctant to reveal that?

A. Sure.

Applicant's habeas counsel also questioned applicant's trial counsel about American Bar Association standards and an attorney's obligation to independently investigate evidence of physical and sexual abuse when the client is not forthcoming about these matters.

Q. [APPLICANT'S HABEAS COUNSEL]: Did you—do you understand, sir, do you agree or disagree that sometimes—well, let me back up here. Do you agree or disagree that in order to perform a competent investigation, a competent pretrial investigation, you have to go beyond simply the matters that the client may tell you?

A. [APPLICANT'S TRIAL COUNSEL]: My experience in criminal law tells me, yes, you need to go past what your client tells you. They tend not to tell you everything, yes.

Q. For whatever reasons, they keep things to themselves?

A. Various reasons they do, yes.

Q. They don't understand certain things that might be mitigating, correct?

A. Sometimes they don't, yes.

Q. All right. And so in order to basically to present the best picture possible regarding the client's background, character, any aspect which is mitigating, you need to perform as thorough a background investigation as possible before you start making a decision as to what to present, correct?

A. Theoretically, sure.

Q. That is sort of the ideals, once you hear that?

A. Ideals are one thing, but you have to deal with what you have in your pockets, yes.

Q. Are you a member of the American Bar Association?

A. Not anymore. I think I was a while back.

Q. Are you familiar with the American Bar Association Standards for Criminal Justice?

A. I have read them.

Q. You have read them. So you are familiar with them, then?

A. Yes, I'm familiar with them.

Q. And you are aware that standard 4–4.1, deals with the Duty to Investigate?

A. Sure, I don't remember the exact number, but there is a Duty to Investigate.

Q. And you are familiar with that standard, right?

A. In the sense that?

Q. Generally.

A. In the sense that I read it, yes.

Q. And that standard is basically saying that you need to do a thorough investigation, going beyond what the client tells you?

A. Yes.

Q. Would you agree with me, that sort of the industry standard as reflected by

the ABA, is to do a complete background investigation as possible before you start making a defensive theory in deciding what to present?

A. I'm not sure what industry, but if you are saying that you need to do as thorough an investigation as you can.

Q. How about the defense bar?

A. The defense bar tries to do as thorough an investigation as they can, yes.

Q. Would the ABA standards suggests [sic] that the defense bar should do that, that that should be the industry standard?

A. The ABA sets a standard that they think is a good ideal, yes.

Q. Sir, have you read a case called, *Wiggins versus Smith* ?

A. Sounds familiar.

Q. Okay. Have you read a case called, *Williams versus Taylor* ?

A. I don't recall.

Q. Okay. Have you heard a case called, *Strickland versus Washington*?

A. Yes.

Q. And in *Strickland versus Washington,* the Supreme Court used the ABA standards as a measure of objectively reasonable defense practice, correct?

A. I think so. I mean, I haven't read it for a while, but I believe so. I had to deal with the effective assistance and all that, and it has been a while.

Q. Would you argue with me that if I tell you under *Wiggins versus Smith* and *Williams versus Taylor,* the Supreme Court also cites to the ABA standard with regards to what is required for of a lawyer to investigate prior to going to trial?

A. Would I argue with you, no, I would not argue with you.

＊ ＊ ＊

Q. And according to the ABA standards, you need to dig pretty darn deep, correct?

A. Well, you know, it is, like, deep. How deep do you want to drill before you figure out you have not hit oil? You need to dig.

In deciding whether applicant's trial counsel exercised "reasonable professional judgment" in his mitigating evidence investigation, it is necessary to objectively review his performance and measure it for "reasonableness under prevailing professional norms," which "includes a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *See Wiggins,* 539 U.S. at 522–23, 123 S.Ct. 2527 (internal quotes omitted). The record fairly reflects that applicant's trial counsel, as seen from his perspective at the time, could reasonably have decided that any further investigation of applicant's background for evidence of a "troubled" childhood would not turn up anything based on trial counsel's interviews with applicant, his uncooperative mother, the other relatives, and the psychologist (Alamia). These sources provided no information regarding a "troubled" childhood that "triggered an obligation to look further." *See Wiggins,* 539 U.S. at 519, 123 S.Ct. 2527 (discussing federal district court's conclusion that counsel's knowledge of defendant's background "triggered an obligation to look further") and at 525, 123 S.Ct. 2527 (scope of counsel's investigation into defendant's background unreasonable in light of what counsel had discovered about the defendant's background from other sources).

That this Court, in hindsight, could conclude that a different investigation by applicant's trial counsel might have discovered the evidence of applicant's background discovered by habeas counsel is not the standard and is not dispositive of appli-

cant's ineffective assistance of counsel claim. *See Wiggins,* 539 U.S. at 523, 123 S.Ct. 2527 (requiring that every effort be made to eliminate the distorting effects of hindsight).[6] Several of the habeas court's findings are worth noting and are set out here:

332. This Court finds that the hindsight affidavits attached to Applicant's application for writ are hardly accurate descriptions concerning what mitigation testimony was available to Applicant's trial attorneys at the time that this case was being prepared for trial and then tried.

333. Instead, as shown by [applicant's trial counsel's] affidavit, which this Court finds credible, Applicant's Houston family members were actually, at the time, very uncooperative with defense counsel and were hardly willing to come to the Rio Grande Valley to testify for Applicant.

\* \* \*

344. This Court further finds that it is easy for Applicant, his habeas attorney, and an investigator hired by said attorney to go to Applicant's family members and friends after Applicant has been sentenced to death and ask them if they would have testified at his trial in order to keep him from receiving such a sentence and that it is also easy for those thus contacted to now say that they would have testified on Applicant's behalf.

345. However, the credible affidavit testimony by Applicant's trial attorneys shows that what Applicant's family members and friends now say with the benefit of 20–20 hindsight does not accurately describe their views at the time Applicant was tried.

346. Said credible information concerning the attitude of Applicant's family members and friends at the time instead shows that the situation which counsel faced at the time of trial was far different than the rosy picture of available, cooperative family members and other defense-favorable witnesses which is presented in the affidavits attached to Applicant's application for writ.

347. In fact, it shows that Applicant's family members had actually been uncooperative with his trial attorneys, unwilling to testify on his behalf, and unconcerned with the prospect of Applicant receiving a death sentence.

Most importantly, a defendant (such as applicant) accused of a death-penalty offense has some obligation to assist his trial counsel in investigating his background information. When such a defendant is not forthcoming with this information,[7] he risks that it will not be presented at his trial. The following discussion from *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052, greatly disposes of any claim that applicant's trial counsel did not adequately investigate applicant's background for evidence of a "troubled" childhood, including physical and sexual abuse:

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are

---

6. For example, we note from Milstein's affidavit that applicant's new evidence of a "troubled" childhood relies heavily on statements by applicant and his mother who apparently are more forthcoming now than they were before applicant's trial. *See also Wiggins,* 539 U.S. at 523–24, 123 S.Ct. 2527 (counsel's duty to investigate further based, in part, on defen-

dant's "description of his own background as 'disgusting,' and observing that he spent most of his life in foster care").

7. The habeas record in this case supports a finding that applicant was not forthcoming with evidence of his "troubled" childhood.

usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's

investigative decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions. (Citation omitted).[8]

Finally, any constitutionally deficient performance by trial counsel in failing to more vigorously pursue a mitigation defense based on applicant's voluntary intoxication at the time of the offense[9] and to further investigate applicant's background did not prejudice applicant. *See Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527 (prejudice assessed by reweighing the evidence in aggravation against the totality of available mitigating evidence). Evidence was also presented at applicant's trial that, while in the county jail awaiting trial for this offense, applicant and another county-jail inmate wrote a letter to President Clinton threatening, in rather vulgar language, to kill him and rape his wife and

---

8. Habeas counsel suggested at the habeas hearing that ABA standards require "a thorough investigation, going beyond what the client tells you." *Strickland*, however, states that ABA standards "are guides to determining what is reasonable, but they are only guides." *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052; *see also Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527 (same but deleting the language "but they are only guides"). It does not appear that *Strickland* was intended to empower the American Bar Association, by promulgating new ABA standards, to negate portions of *Strickland* and the Constitution. And, despite *Wiggins'* deletion of *Strickland's* "but they are only guides" language, *Wiggins* still retains *Strickland's* language that ABA standards "are **guides** to determining what is reasonable." *See Wiggins*, 539 U.S. at 524, 123 S.Ct. 2527. (Emphasis added).

9. I agree with the Court's ultimate conclusion that counsel was not deficient for failing to present a mitigation case based on temporary insanity caused by applicant's voluntary intoxication. Several of the habeas court's findings on this issue are also set out:

275. After all, reliance on the theories Applicant and habeas counsel say trial counsel should have urged would have involved tell-

ing the jury that it should consider the fact that Applicant had taken rohypnol on the night in question as a factor mitigating against the death penalty for killing a 68–year–old widow and her blind 4–and–a–half–year–old granddaughter because the drug made him temporarily insane; that he had thus not understood or appreciated the wrongfulness of his conduct; and that the rohypnol may have even caused aggressive behavior or a "rage reaction."

276. Such an argument would have also forced counsel to try to explain how Applicant, though allegedly temporarily insane and not able to comprehend the wrongfulness of his conduct, was nonetheless coherent enough to repeatedly mention the need to go back to the scene and recover the weapon he had left behind.

277. A competent attorney could certainly take the position that any attempt to argue those theories would backfire on the defense by making the jury believe that Applicant and his attorneys were simply trying to explain away his unconscionable behavior and escape the consequences of his actions.

278. Such an attorney could also adopt the view that such evidence of voluntary intoxication on rohypnol would be viewed by the jury as an aggravating circumstance, rather than a basis for mitigation.

daughter. When a U.S. Secret Service Special Agent questioned applicant about the letter, applicant admitted that he wrote the letter, and he "reiterated every sentiment expressed in the letter."[10] The habeas court's findings summarize this letter.

> Those items say that the author was writing to the "fucking president": that his name is [applicant]; that he and his friend Jamie Charles Nunn were going to kill the President; that he was going to "fuck" the President's daughter; that he wanted the President to see him "fuck" his wife and his "stupid ass" daughter; that they were then going to kill the President or "blow (up)" the White House: and that he and his friend were in jail. (R. XLIV–92). They then say that Applicant just wanted the President to know what was going to happen to "the mother-fucker"; that he and Nunn wanted to do "that" but were locked up; that he had gotten some guys that work for them who would do it; that he was 18–years–old and his friend Jamie was 19; that they had connections and wanted to kill the President; and that Applicant and Jamie were then going for the Vice–President too. (R. XLIV–92).

> The exhibits then states [sic] that Applicant hates the President; that the President is not doing a "fuck thing"; that he wants the President's daughter to feel "my dick in her mouth" and his wife too;

that Applicant must close the letter; and that "we" just want the President to die. (R. XLIV–92). They also indicate that the letter was signed "Your friend (sic), [applicant] and Jamie Charles Nunn" and that a second page stated "I do not fuck around. I want him dead". (R. XLIV–92–93).

The State also presented some powerful victim-impact evidence. The habeas court's findings summarize this evidence. For example,

> Patricia Palomo said that she had not believed what was happening when she came into her mother-in-law's house and saw her mother-in-law and her daughter; that she couldn't believe that it was happening to her mother-in-law and her baby; that Amanda was everything to her; and that it was very difficult for her to have children, as she could not carry them full term. (R. XLIII–23–24). She also said that she had lost her first baby; that Amanda had then been born prematurely and had not been expected to live; that she felt that she had failed to protect Amanda like she was supposed to; and that she wakes up every day, wants to start to fix Amanda breakfast and get her ready for school, and then stops and wonders what she is doing. (R. XIII–24–25).

> Ms. Palomo then explained that she has been in denial that Amanda is dead; that she wanted it to be the same as it

---

10. The relevant portion of this Court's opinion on direct appeal states:

> At the punishment phase of trial, U.S. Secret Service Agent Juan Landa testified that he went to [sic] Hidalgo County jail to question [applicant] about a letter he had written wherein he threatened to kill the President and rape his wife and daughter. (Footnote omitted). Another inmate also signed the letter. While questioning appellant, Landa obtained a written statement from him in which he admitted writing the

letter and reiterated every sentiment expressed in the letter. In a hearing outside the presence of the jury, it was brought out that Landa had generated a report on the incident which apparently concluded that appellant felt little to no remorse about the instant capital murder. Landa was not questioned about this report nor was it otherwise brought before the jury.

*Martinez v. State,* slip op. at 47–48 (Tex.Cr. App. No. 72,704, delivered June 30, 1999) (not designated for publication).

was before; that she would always reassure Amanda that she would always protect her; that she cannot live without her baby and wishes she was dead; and that she had thought about suicide, but had decided not to kill herself since her faith taught her that suicide would keep her from seeing Amanda in heaven. (R. XIII–25–26).

This witness then stated that she had first heard the details of what had happened while listening to the prosecution's final argument; that she could not believe that a person could do that to another human being and a baby; that she could not believe what she was hearing about what her baby had gone through; that she had wished that it had happened to her; and that she could not believe the way the victims were killed. (R. XLIII–26–27).

The totality of the available mitigating evidence does not outweigh the evidence in aggravation. *See Wiggins*, 539 U.S. at 534, 123 S.Ct. 2527. There is no reasonable probability that applicant's "troubled" childhood evidence would have caused anyone on applicant's jury to answer the special issues any differently than they did at applicant's trial in light of the brutal nature of this offense, applicant's subsequent threats of more rape and murder and the other circumstances. *See id.; compare Miniel v. Cockrell*, 339 F.3d 331, 347–48 (5th Cir.2003), *cert. denied*, 540 U.S. 1179, 124 S.Ct. 1413, 158 L.Ed.2d 81 (2004) (petitioner's "past violent behavior would overwhelm any of the proposed mitigating evidence [of petitioner's 'rough' childhood] in determining future dangerousness ... [petitioner] has failed to present 'evidence of sufficient quality and force to raise a reasonable probability that, had it been presented to the jury, a life sentence would have resulted' ").

With these comments, I concur in the Court's judgment to deny habeas corpus relief.