

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-13-00142-CR

NIJINSKI TWON MURPHY, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 420th District Court
Nacogdoches County, Texas
Trial Court No. F1219426

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

State's witnesses described a bizarre episode in Nacogdoches County[1] in July 2012, in which Nijinski Twon Murphy lay motionless on the ground in a residential neighborhood, talked to the sky, made some statements about being God or the anti-Christ, and later took up a machete, broke into at least two nearby trailer houses in apparent anger, and inflicted numerous machete wounds on various individuals. Somewhat less bizarre is the dizzying array of arguments and claims Murphy attempts to make pro se[2] in numerous filings[3] with this Court in seeking to have us reverse the trial court's judgments containing his three convictions[4]: aggravated assault of Adrian Colegio with a deadly weapon, burglary of the habitation of Teresa Colegio to attempt or commit aggravated assault with a deadly weapon, and burglary of the

---

[1] Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2] Murphy stated in his notice of appeal that he wished to prosecute his appeal pro se. On August 1, 2013, we abated the case to the trial court to confirm that he wanted to represent himself, to fully admonish Murphy about his election, and to make other findings so we could determine the actual status of Murphy and his appeal. Based on the trial court's findings, we exercised our discretion to allow Murphy to represent himself on appeal.

[3] Murphy has filed a number of documents at various times, apparently as his stream of consciousness allowed him to conjure up a new argument or what he believed to be a new twist on an old one (including a brief filed September 9, a brief filed September 20, a document labeled as the "Final Brief" filed September 24, and yet another brief filed three months later). Although we will not construct arguments or issues for Murphy, we parse out the arguments that actually exist in his filings and will address those that we can discern. The State's response to Murphy's efforts was to throw up its hands. The body of the State's "brief" is one page long, including a statement of the case providing nothing more than the information found in the judgment. The State's argument consists of three sentences, in which it "finds Appellant's arguments to be improperly briefed and incomprehensible," states that it is reluctant to compose arguments or issues on Murphy's behalf, and then issues a general denial of Murphy's arguments. The State's brief is not helpful.

[4] Murphy's convictions are based on three counts, all arising from the events of July 2, 2012. Count one charged the aggravated assault of Adrian Colegio with a deadly weapon and resulted in a fifteen-year sentence, plus costs of $200.00. Count two charged the burglary of the habitation of Teresa Colegio, while count three charged the burglary of the habitation of Patricia Olmeda. On each burglary conviction, Murphy was sentenced to seventy-five years' imprisonment.

2

habitation of Patricia Olmeda to attempt or commit aggravated assault with a deadly weapon. Because (1) sufficient evidence supports Murphy's convictions and (2) Murphy's other claims are unpreserved or unsupported, we affirm the judgments of the trial court.

*(1)      Sufficient Evidence Supports Murphy's Convictions*

Murphy's primary attack with most of his arguments seems to be on the sufficiency of the evidence to prove the three charges.  Murphy claims that the evidence showed that the victims had attacked him, that there was a lack of fingerprint and DNA evidence, that inconsistent pictures of the machete undermine his convictions, and that the real alleged victims never attended his trial but were replaced with friends or family members.  He argues that the evidence that he had used both a hammer and a machete was unbelievable because he would have been seen running around with one in each hand, and there was no evidence of that.  He asserts that there was no or insufficient evidence of the ownership of the two residences, of his entry into the residences, or of injury to the alleged victims.  He posits that the testimony that he used a sledgehammer to gain entry at one residence is undermined by the photographs that show no damage to the door.  Other claims include that the crime scene was staged, that Adrian was not credible, and that there were inadequate photographs of the claimed injuries.  He argues that the jurors obviously had a major doubt concerning his guilt because the bailiff had to go and ask them to quiet down in the jury room.

In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 912 (Tex.

3

Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

We measure the sufficiency of the evidence against the hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). A hypothetically correct jury charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Id.*

To convict Murphy of aggravated assault as was charged here, the State needed to establish that he (a) intentionally, knowingly, or recklessly (b) caused bodily injury to Adrian by using a deadly weapon—a machete. *See* TEX. PENAL CODE ANN. § 22.01(a)(1) (West Supp. 2013) (defining assault), § 22.02(a)(2) (West 2011) (defining aggravated assault as assault while using or exhibiting deadly weapon).

To convict Murphy of burglary of a habitation as was charged here, the State needed to establish that he intentionally or knowingly entered habitations without the effective consent of Teresa (count two) or Patricia (count three), the "owner" thereof, and that he attempted to or did

4

commit the felony offense of aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. § 30.02 (West 2011).

In our analysis, we must recognize that the jury is the exclusive judge of the credibility of witnesses and of the weight to be given their testimony, and reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). The jury may choose to believe some testimony and disbelieve other testimony. *Id.*

The record contains ample evidence. Murphy was originally seen wandering the area talking to the sky and lying in a ditch. Residents called police. Alvin Bailey, a former Sheriff's deputy in Nacogdoches County, testified that he had responded to a call to investigate an intoxication complaint. Bailey knew Murphy and testified that he arrived on the scene, saw Murphy standing in the ditch, and began talking to him. Bailey testified that he smelled no alcohol but that Murphy's demeanor was not "normal." "He kept saying he was the antichrist; he was God." Bailey talked to Murphy, concluded there was no evidence he was a danger to anyone and left him there. Several hours later, as a result of the violence, Bailey and two other officers responded to another call at that location and found Murphy there, along with a number of agitated Hispanic men, women, and children. One officer took Murphy to the hospital for treatment, and officers began reviewing the scene. Officers discovered blood spatter outside and inside the nearest residence and concluded that forced entry was apparent. Bailey also saw some victims who had visible cuts.

5

Patricia testified that Murphy had spent several hours lying in the ditch in front of their house, to the extent that she sent her husband out to see if he was dead. Late that afternoon, one of Patricia's children came running to her saying that there was someone with a knife coming toward the house. Patricia testified that, by the time she got up and looked through the window, Murphy was already on the front porch kicking their door with a machete in his hand. Murphy kicked in the front door and entered the residence. He then retreated out that door and went around to the back. Patricia and her children ran out the back of the house, where they were intercepted by Murphy. She told her children to run and then distracted Murphy by asking him questions. Murphy said, "I am the antichrist; and where do you want your 666 at?" Then he hit her on the neck with the machete while her son hit him. Patricia testified that she was hit three times with the machete, once on the neck and twice on her arms.

She escaped to Adrian's neighboring house and was followed there by Murphy, who attempted but failed to get inside. She testified that Murphy then went to another adjoining mobile home belonging to Adrian's mother, Teresa, and succeeded in breaking in. Patricia testified that Murphy entered and that she heard Teresa and her daughter, Julye, screaming from inside. Adrian ran across to help Teresa, and Patricia ran to the street looking for help. Patricia pointed out the places she had been cut by Murphy with the machete, describing one as being about six inches long.

Ismael Olmeda, the son of Patricia, also testified to much the same effect: that Murphy invaded the house after beating on the door with a sledgehammer, chased them out of the house,

6

and attacked and cut Patricia.[5]  After they ran out the back, Ismael saw Murphy attacking Patricia, returned to defend her, and stabbed Murphy in the back with the kitchen knife.  Patricia escaped, and Murphy ran to one of the adjoining houses and broke in.  Ismael testified that he heard banging and screaming from inside that house and that Murphy went in with the machete in hand.  Ismael did not recall seeing Murphy with it after he emerged from the house.

Julye was at the house of Teresa, her mother.  Julye testified that she was inside and heard Teresa screaming outside about someone attacking the neighbor.  Julye brought Teresa inside, while Murphy went next door to her father's trailer and tried to break in and then came to Teresa's house.  Julye attempted to hold the door shut, but Murphy successfully broke in and chased them through the house, flailing about with the machete.  Julye and Murphy grappled, but he broke free and hit her with the handle end of the machete, cutting her eyebrow open.  She fell, and he pulled her head up as if to cut her throat.  At that point, Teresa ran up and put her arm across Julye's throat.  As a result, Murphy's swing caused a cut on Teresa's arm rather than on Julye's neck.  At some point, while Julye was down, Murphy also bit Julye's arm.  Adrian came back in and began hitting Murphy with a length of sewer pipe without noticeable effect.  Adrian then switched weapons to a piece of two-by-four lumber.  Adrian's use of the two by four eventually served to chase Murphy out of the house.

Dr. Lawrence Robinson testified about the nature of the various injuries, fractures, muscle injuries, and multiple lacerations.  He explained to the jury that several injuries, being puncture wounds caused by bladed weapons, were of the type that can cause death.

---

[5]Ismael testified that the sledgehammer belonged to their family, it had been used recently and left on the front porch.

Murphy also testified, against his attorney's advice. His testimony paints a completely different picture. Murphy denied causing injuries, claimed he began chasing people only because he wanted help, and recounted that he was confronted by a person armed with a firearm that instigated his actions. He went on to testify that the people actually involved were not the ones who appeared at trial. Murphy's testimony is not particularly coherent.

> [T]his dude come [sic] out of nowhere like he just come [sic] from invisible or something, you know. Because when he -- he was right up on me. I mean, before I could even bat my eye, dude just whacked me. He didn't stab me, he cut me and kept running. I was like, Man. And he was running fast. I mean, me at my top speed, this dude was like fast. And he was -- he was a real bright light. Light dude. Real light. He was like a Latino.

Murphy testified that he went to the house with the women in it to ask them to call an ambulance, but

> some way I -- I just couldn't get it out [of] my mouth, like something was just stopping me from being able to say, Get me help, and wanted me to do something else. At the same time my mind was thinking. And my mind was telling me to do one thing, and I was trying to tell them another thing. Like something was really just trying to just force me to do something. And I didn't want to do nothing. You know, I don't -- like, I don't know what he had. Whoever had it planned. But, you know, I've been going through some stuff; and I just said, I ain't -- I ain't going along with it, you know. I'm not doing no -- I am not going invisible. Stuff been telling me to go invisible. I'm not doing that. I'm faithful, to the man that created the beginning. I am not doing that.

This record contains testimony from the individuals named to the effect that they were the owners[6] of the habitations, that Murphy invaded the homes armed with a machete, and that Murphy chased down and ultimately injured the named victims with the machete. Contrary to

---

[6]An "owner" is a person who "has title to the property, possession of the property, whether lawful or not, or a greater right to possession than the actor." TEX. PENAL CODE ANN. § 1.07(a)(35) (West Supp. 2013). Therefore, anyone with a greater right to possession of the premises than a defendant may be alleged as the "owner" in a burglary prosecution. *Mack v. State*, 928 S.W.2d 219, 222 (Tex. App.—Austin 1996, pet. ref'd).

8

Murphy's argument, documents showing ownership are not required to meet the burden of proof. There is testimony about the nature and extent of physical injuries of each victim, and evidence that the types of injuries caused by Murphy's use of the machete caused a substantial risk of death. Accordingly, there is evidence to support the jury's finding that Murphy committed the three charged crimes. There is only minimal evidence that any other course of events occurred, exclusively from Murphy's testimony, which could be disbelieved by the jury, even if it were logical. There are also very few discrepancies among the witnesses, all of which are minor and are explainable by the different points of view of the different witnesses.

Murphy argues that there was insufficient evidence that he used a sledgehammer to force entry. That evidentiary question is not an element of the offense: proof of nonconsensual entry by any means is sufficient. Nevertheless, we point out that, in this case, there was evidence that he used a sledgehammer on one door, used the machete to pry at another while kicking it open, and attempted and failed to do likewise to a third.

Sufficient evidence supports Murphy's convictions.

*(2)*     *Murphy's Other Claims Are Unpreserved or Unsupported*

In Murphy's various filings, he goes beyond addressing just the evidence against him. He attacks the indictment, his trial counsel, various concerns with the fairness of his trial, and the integrity of the evidence.

In his attacks on the indictment, Murphy also complains about the misspelling of his name in the indictment and argues that the second and third counts are inadequately pled because they generally state that he used a deadly weapon during the home invasion, rather than stating

9

that he used a machete. If a defendant does not object to a defect, error, or irregularity of form or substance in an indictment or information before the date on which the trial on the merits commences, he or she waives and forfeits the right to object to the defect, error, or irregularity and may not raise the objection on appeal or in any other post-conviction proceeding. *Ramirez v. State*, 105 S.W.3d 628, 630 (Tex. Crim. App. 2003); *Studer v. State*, 799 S.W.2d 263, 266 (Tex. Crim. App. 1990). These attacks are unpreserved and are overruled.

Murphy claims his trial attorney was ineffective in not filing a motion for speedy trial despite Murphy's demand for such, in failing to do background checks on the victims and witnesses, and in failing to question them about the statements that were changed at trial. We apply the two-pronged *Strickland* test handed down by the United States Supreme Court to determine whether Murphy received ineffective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984); *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009). Failure to satisfy either prong of the *Strickland* test is fatal to such a claim. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). Because Murphy has not shown that his counsel's performance fell below an objective standard of reasonableness in light of prevailing professional norms, these claims fail. *See Strickland*, 466 U.S. at 687–88.

Murphy also complains that jurors and court personnel misbehaved, were tampered with, or were biased, that there was a conspiracy to convict him, that police or bystanders staged the entirety of the crime scene, and that evidence was falsified, destroyed, suppressed, or tampered with. However, the record contains no support, either directly or by implication for any such contention. The complaints fail.

10

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted: February 12, 2014
Date Decided: March 4, 2014

Do Not Publish