

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-23-00192-CR

———————————————

JUSTIN MORGAN GREENE, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 235th District Court
Cooke County, Texas
Trial Court No. CR22-00359

Before Birdwell, Womack, and Walker, JJ.
Memorandum Opinion by Justice Birdwell

# MEMORANDUM OPINION

Appellant Justin Morgan Greene pleaded guilty to aggravated assault with a deadly weapon. *See* Tex. Penal Code Ann. § 22.02(a)(2). He pleaded true to the State's enhancement paragraph related to a prior felony conviction for family-violence assault and elected to have a jury assess his punishment. The jury assessed his punishment at fifty-five years' confinement.

In a sole point of error, he argues that he received ineffective assistance of counsel because his trial counsel failed to present certain mitigating evidence related to his mental health history. Because we conclude that counsel's performance was not deficient and that Greene was not prejudiced by any alleged deficiency, we affirm.

## I. Background

After stealing a vehicle, Greene walked into a convenience store and muttered something to the store clerk. The clerk did not hear him, so she leaned forward and said, "[E]xcuse me?" Greene told her, "I want to see your F-ing blood," and he stabbed her in her neck with a knife. He then ran away.

At Greene's punishment trial, the jury heard testimony from one of the police officers who responded to Greene's location after he fled from the convenience store, the paramedic who treated the store clerk, the store clerk, and her husband. The State offered and the trial court admitted various exhibits, including videos from the officer's body camera and from surveillance cameras both inside and outside the

convenience store. The defense then called three witnesses: Greene, his mother, and his sister. The defense did not offer any defense exhibits into evidence.

## A. The State's Case

Officer Lauren Trevino testified that when Greene was initially apprehended by responding officers, he spoke with them and did not fight. That did not last; while Officer Trevino transported Greene in her patrol vehicle, he managed to get out of his seatbelt and move his handcuffs to the front of his body. After Officer Trevino had parked and gotten out of her vehicle, she noticed that it was shaking and that Greene was trying to break a window. She and the other officers removed him from the vehicle to secure his handcuffs, and he became violent.

Officer Trevino testified that it had taken five police officers—four of whom were male—to restrain Greene. He exhibited excessive strength and violence, and despite the cold, wet weather at the time, his skin was hot to the touch. In one of multiple physical altercations with Greene, Officer Trevino was injured when he bit her and pulled her thumb out of its socket. She testified that in her opinion and based on her law-enforcement experience, Greene's behavior had been the result of illegal drug use.

The paramedic who treated the store clerk testified that when he arrived at the convenience store, she was bleeding from the wound in her neck. He did what he could to stop the bleeding and transported her to the hospital. He testified that neck wounds are considered "critical" injuries due to all the veins and arteries and the

3

airway in that area. He then described the severity of the store clerk's injuries and explained that if she had been stabbed just one inch to the left or right of her stab wound, it could have been fatal.

The store clerk testified about the attack and her injuries. She told the jury what Greene had said to her and described where and how he had stabbed her. After he stabbed her, she felt a burning sensation and grabbed her neck, which had started bleeding "a lot." She was scared but managed to stay calm. Her husband, who had been at the convenience store to help her close at the end of her shift, called 911 and followed Greene out of the store. Greene was gone by the time the paramedics arrived.

The store clerk had to have surgery to repair her salivary gland, her thyroid gland, and the artery that ran between them; they had been sliced by the knife. She testified that she was very lucky because the knife could have killed her. At the time of trial, she continued to deal with scar tissue and numbness in her lips and chin. She told the jury that she thought about the attack every day and that she still had nightmares.

The store clerk's husband testified that he had not seen Greene stab his wife and that he had not realized anything was wrong until he saw her reach for her gun that she carried. At that point, he stood up. Greene made eye contact with him before running out the door. The husband chased Greene out of the store and drew his own gun, yelling for Greene to stop. He shot at the tires of Greene's vehicle, and Greene

4

fled on foot. The husband then returned to the store to help his wife, who was holding napkins to her neck. He testified that he had been scared for her.

During the husband's testimony, the jury viewed the surveillance footage from the store that day. He testified that watching the footage made him want to hurt Greene. He told the jury that his wife was lucky to be alive. Since the attack, he had started going to work with her every day. He did not sleep much anymore because he would keep an eye on her at night and wake her up when she started screaming in her sleep.

Before the State rested, it offered Greene's certified priors for the enhancement paragraph. In September 2017, Greene was convicted of continuous family-violence assault causing bodily injury, *see id.* § 25.11, and sentenced to ten years' confinement, probated for five years. Approximately eighteen months later, Greene's community supervision was revoked, and he was sentenced to four years' confinement. The trial court admitted the judgments into evidence.

## B. The Defense's Case

Greene testified that when he went into the convenience store, he believed that he was being followed by "cyborgs." He thought the store clerk was a cyborg and wanted to "make sure" she was human by seeing her blood. He claimed that he had "freaked out" when he saw her gun.

Greene testified that he had been hallucinating and that he was "outside of [his] mind" when he stabbed the store clerk and when he later became violent with the

5

police officers. He explained that he had smoked methamphetamine that morning and that he had been smoking it for two straight weeks. Greene admitted that he had been using methamphetamine "off and on" for eighteen years—beginning when he was fifteen years old.

Greene also testified that he had a history of mental illnesses. When he was thirteen years old, he was diagnosed with bipolar disorder and manic depression. By the time of trial, he had also been diagnosed as schizophrenic. Approximately six weeks before he attacked the store clerk, Greene was released from commitment at a state hospital. He went to MHMR and received medication for his diagnoses. When he ran out of his medication, he began self-medicating with methamphetamine. He started hallucinating and then became paranoid, which ultimately led to the attack.

Greene told the jury that he took "full responsibility" for the attack, and he apologized for what he had done to the store clerk and to her family in the process. He testified that in the future, he would check himself into the state hospital when he ran out of his medication and that he would "probably not use illicit drugs anymore." Greene explained that he deeply regretted his actions and asked the jury to show him mercy.

On cross-examination, the State asked Greene about his criminal history. He testified that he was arrested for assault in 2011 and 2013. Regarding his September 2017 conviction for continuous family-violence assault, he explained that he had grabbed the mother of his children and had "shook her up." He had also been

6

arrested for disorderly conduct—once when the police were looking for drugs in his hotel room and once when he displayed a firearm—and for unlawful possession of body armor by a felon, and he had pled guilty to resisting arrest. Greene recalled the facts of these incidents and testified to specific details, remembering some of them "quite well." For the family-violence incident, Greene explained that he had been drinking. For the body-armor incident, he explained that he had been "off [his] medication" but that he "might have been" smoking methamphetamine. Regarding the other incidents, Greene provided no excuses for his actions.

Greene's mother testified about Greene's mental illnesses and explained that he had been diagnosed with bipolar disorder, manic depression, and schizophrenic affective disorder. She confirmed that Greene had been released from a state hospital six weeks before he attacked the store clerk and explained that he had also been hospitalized once before that. For both hospitalizations, she had sought an emergency mental health warrant on his behalf. According to Mother, Greene had stopped taking his medication because he "felt like he didn't need it or it wasn't helping." She told the jury that Greene was not a violent person when properly medicated.

Mother also testified that mental illness "runs in the family." Greene's father and brother had been diagnosed as bipolar, manic, and schizophrenic, and both had been diagnosed with Huntington's disease, which she described as a terminal illness that "kills . . . brain cells." Mother asserted that Huntington's disease was a hereditary

condition, but when counsel asked her whether Greene himself had ever been formally diagnosed with the disease, she said no.

Mother then testified generally about Greene's family and his life prior to the attack, stating that he had been doing well. She told the jury that she did not want to see her son go to jail for the better part of his life, that he needed medical and mental help, and that she would continue to try to help him manage his mental health treatment.

Greene's sister described him as a "great dad" and a "great brother" who "love[d] to spend time with his family." She testified that he had "always" had mental health issues and that he had suicidal ideations. When asked about Greene's commitment to the state hospital, Sister became emotional and explained that he had stopped taking his medication. She told the jury that Greene was not inherently violent and that if he were released, she would "continue to help ensure" that he took his medication. Sister asked the jury to have mercy on her brother.

During his closing argument, Greene's trial counsel told the jury that Greene would have to live with what he had done to the store clerk for the rest of his life. He argued that Greene had been hallucinating and that someone who had been "voluntarily using methamphetamines up for a long time" did not know what he was doing. Counsel mentioned Greene's history of mental illnesses and asserted that he would not go unmedicated again, but he also stated that Greene's "mental defects" were not an excuse. He urged the jury, "Don't throw away [Greene's] life. Don't

8

throw away his ability to be a part of a family . . . ." Counsel finished his argument by asking the jury to give Greene a chance.

## C. The Verdict

The jury assessed Greene's punishment at fifty-five years' confinement, and the trial court entered its judgment on the verdict. Greene timely appealed.

## II. Standard of Review

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel. *Ex parte Scott*, 541 S.W.3d 104, 114 (Tex. Crim. App. 2017); *see* U.S. Const. amend. VI. To establish ineffective assistance, an appellant must prove by a preponderance of the evidence that his counsel's representation was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Nava v. State*, 415 S.W.3d 289, 307 (Tex. Crim. App. 2013); *Hernandez v. State*, 988 S.W.2d 770, 770 (Tex. Crim. App. 1999). The record must affirmatively demonstrate that the claim has merit. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999).

When an appellant's ineffective-assistance claim challenges his trial counsel's failure to call witnesses, the appellant "must show that [such witnesses] had been available to testify and that [the] testimony would have been of some benefit to the defense." *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007) (internal quotation omitted).

In evaluating counsel's effectiveness under the deficient-performance prong, we review the totality of the representation and the particular circumstances of the case to determine whether counsel provided reasonable assistance under all the circumstances and prevailing professional norms at the time of the alleged error. *See Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065; *Nava*, 415 S.W.3d at 307; *Thompson*, 9 S.W.3d at 813–14. Our review of counsel's representation is highly deferential, and we indulge a strong presumption that counsel's conduct was not deficient. *Nava*, 415 S.W.3d at 307–08.

An appellate court may not infer ineffective assistance simply from an unclear record or a record that does not show why counsel failed to do something. *Menefield v. State*, 363 S.W.3d 591, 593 (Tex. Crim. App. 2012); *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007). Trial counsel "should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective." *Menefield*, 363 S.W.3d at 593. If trial counsel did not have that opportunity, we should not conclude that counsel performed deficiently unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308. Direct appeal is usually inadequate for raising an ineffective-assistance-of-counsel claim because the record generally does not show counsel's reasons for any alleged deficient performance. *See Menefield*, 363 S.W.3d at 592–93; *Thompson*, 9 S.W.3d at 813–14.

*Strickland*'s prejudice prong requires a showing that counsel's errors were so serious that they deprived the defendant of a fair trial—that is, a trial with a reliable

result. *Strickland*, 466 U.S. at 687, 104 S. Ct. at 2064. In other words, an appellant must show a reasonable probability that the proceeding would have turned out differently without the deficient performance. *Id.* at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *Nava*, 415 S.W.3d at 308. We must ultimately focus on examining the fundamental fairness of the proceeding in which the result is being challenged. *Strickland*, 466 U.S. at 696, 104 S. Ct. at 2069. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.*, 104 S. Ct. at 2069.

### III. Analysis

In his sole point of error, Greene argues that his trial counsel was ineffective because he failed to "investigate [Greene's] mental health history, request a mental health examination, obtain and/or admit court records regarding civil commitments, obtain and/or admit mental health records, contact [Greene's] treatment providers, or call a mental health expert to testify." Greene also argues that counsel should have "[i]nvestigate[d] Huntington's [d]isease" and called an expert witness to testify about the disease. He contends that the "supporting documentation and[] expert testimony would have mitigated the effect of [his] behavior" when he attacked the store clerk and his criminal history.

11

Greene did not file a motion for new trial alleging ineffective assistance of counsel, and his trial counsel unexpectedly died forty days after the date that his judgment of conviction was entered. *See* Tex. R. App. P. 21.4 (requiring motion for new trial be filed within thirty days after date judgment signed). Thus, there was no hearing at which counsel testified regarding trial strategy. *See Ex parte Covarrubias*, 665 S.W.3d 605, 610 (Tex. Crim. App. 2023) ("We should be circumspect in our analysis of ineffective assistance claims in light of trial counsel's inability to respond . . . ."); *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002) ("If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal."). Based on the limited record before us, we cannot conclude that counsel's conduct was "so outrageous that no competent attorney would have engaged in it." *Nava*, 415 S.W.3d at 308.

## A. No Deficient Performance

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary . . . ." *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. This duty requires counsel to "investigate the facts of the case and determine if an expert is necessary to present the defendant's case to the jury and, if so, to obtain competent expert assistance." *Ex parte Flores*, 387 S.W.3d 626, 636 (Tex. Crim. App. 2012). But "*Strickland* does not require counsel to

12

investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533, 123 S. Ct. 2527, 2541 (2003). Nor does it require counsel "to present mitigating evidence at sentencing in every case." *Id.*, 123 S. Ct. at 2541. When counsel ultimately decides not to investigate or present certain mitigating evidence, *Strickland* requires that counsel "put forth enough investigative efforts to base [his] decision . . . on a thorough understanding of the available evidence." *Ex parte Woods*, 176 S.W.3d 224, 226 (Tex. Crim. App. 2005). The decision "must be directly assessed for reasonableness in all the circumstances." *Wiggins*, 539 U.S. at 533, 123 S. Ct. at 2541 (quoting *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066).

Here, the record does not demonstrate that counsel put forth an insufficient investigative effort or that he lacked a thorough understanding of the available evidence. Rather, it shows that he *did* investigate the facts of this case and recognized the evidence both for and against his client in developing a defensive strategy.

For example, Greene's argument that counsel should have "[i]nvestigate[d] Huntington's [d]isease" and presented expert testimony of the same occupies several pages of his appellate brief. The record reflects, however, that while Greene's father and brother had been diagnosed with Huntington's disease, Greene himself had not. Counsel was clearly aware of this fact in deciding not to present expert testimony on a disease that Greene did not have. During Mother's testimony, counsel confirmed that Greene had never been diagnosed with Huntington's disease after she testified that it

13

was a hereditary condition. Counsel did not inquire further or ask any other defense witnesses about the disease, nor did he mention it during closing argument. We cannot say that counsel's strategy in handling the evidence of Huntington's disease—or lack thereof—was unreasonable.

Nor can we say that counsel's strategy in handling the evidence actually related to Greene's mental health history was unreasonable. While there was evidence that Greene had a history of mental illnesses, there was also evidence that he had an eighteen-year history with methamphetamine and that he had been self-medicating with it in the weeks before the attack. Indeed, he may have been hallucinating when he attacked the store clerk, but the evidence revealed that his hallucinations were not the product of any mental illness but were the direct result of his voluntary intoxication via methamphetamine.

Greene's trial counsel, having apparently grasped this evidence, asked the jury for "mercy." In his opening statement, counsel told the jury that the evidence would speak for itself and that Greene, when he attacked the store clerk, "was not capable of understanding what he was doing, *by his own fault*." [Emphasis added.] Counsel asked the jury, "How long [of a punishment] is enough to teach him, you are not allowed to self-medicate, Mr. Greene." Then during the defense's case, Greene, his mother, and his sister also asked the jury to show mercy in assessing his sentence.

Furthering that strategy, counsel's closing argument focused on "fairness." He pointed out that Greene had taken responsibility for his actions and that he had not

14

tried to plead an insanity defense, specifically acknowledging that Greene's "mental defects" were not an excuse. Counsel then asserted that Greene was "appalled at himself" and urged the jury to assess punishment at ten to twenty years' confinement.

Contrary to Greene's assertion that his mental health "*was* the basis for [his] defense," it is just as likely—if not more likely—that counsel's defensive strategy was to present Greene to the jury as a defendant who deserved its mercy because, among other reasons,[1] he had a history of mental illnesses. Notably, the State even recognized this defensive strategy and rebutted it, arguing to the jury, "Please show [Greene] the mercy that he showed [the store clerk] on [the day he attacked her], and that's absolutely nothing." Based on the record before us, we must defer to counsel's strategic decisions. *See Ortiz*, 93 S.W.3d at 88–89.

Further, Greene's ineffective-assistance argument is flawed because it makes two inferential leaps: (1) because counsel did not call a mental health expert to testify, he failed to seek the assistance of a mental health expert and (2) because counsel did not offer documentary evidence of Greene's mental health history, he failed to

---

[1]In addition to presenting evidence of Greene's mental health history, counsel made sure that the jury knew about the family that Greene would leave behind while he served his sentence—through the testimony of defense witnesses and when counsel addressed the jury himself:

> We're going to ask you to have mercy on him. Sentence him to a reasonable sentence, but let him go back to his family and go forward without sin. . . . Does he deserve to be punished? Absolutely.
>
> The question is for how long. How long do we take this young man away from his family, his children.

request or obtain such documentary evidence. *Cf. Riggins v. State*, No. 01-08-00693-CR, 2010 WL 2991222, at *5 (Tex. App.—Houston [1st Dist.] July 29, 2010, no pet.) (mem. op., not designated for publication) (rejecting similar argument). Greene has not shown that counsel failed to consult with a mental health expert or to request or obtain documentary evidence of Greene's mental health history—by contacting Greene's treatment providers, requesting a mental health examination, or otherwise. Nor has Greene shown that a mental health expert was available to testify or that a mental health expert's testimony would have been beneficial to his defense. *See Ramirez*, 280 S.W.3d at 853; *Starr v. State*, No. 01-18-00947-CR, 2020 WL 4006447, at *6 (Tex. App.—Houston [1st Dist.] July 16, 2020, no pet.) (mem. op., not designated for publication) (quoting *Ramirez*).

With the record silent as to why counsel did not present the testimony of a mental health expert or offer documentary evidence of Greene's mental health history, we cannot infer that counsel was ineffective. *See Menefield*, 363 S.W.3d at 593; *Mata*, 226 S.W.3d at 432. On this record, it is just as likely that no favorable evidence or testimony was available. *See Riggins*, 2010 WL 2991222, at *5.

## B. No Prejudice

Even if we could somehow conclude that counsel's failure to present the testimony of a mental health expert or documentary evidence of Greene's mental health history constituted ineffective assistance of counsel, Greene has failed to show a reasonable probability that the proceeding would have turned out differently if

counsel had done so. The jury heard a great deal of testimony about Greene's mental health history from Greene, his mother, and his sister. While favorable expert testimony and supporting documentary evidence—assuming there had been any— would have bolstered the lay witness testimony,[2] it likely would not have influenced Greene's punishment.

First, it is unclear from the record whether the new alleged mitigating evidence would have substantially differed from the evidence actually presented at sentencing. *See Ex parte Martinez*, 195 S.W.3d 713, 731 (Tex. Crim. App. 2006) (holding that even if sentencing evidence had "merely scratched the surface," new mitigating evidence that did not differ in a substantial way would have had no effect on the outcome (citing *Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir. 2005))); *Parker v. State*, 462 S.W.3d 559, 565 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Martinez*).

Second, the new alleged mitigating evidence would not have rebutted the evidence that he attacked the store clerk because he was on methamphetamine. *See Martinez*, 195 S.W.3d at 731 (concluding that even though omitted mitigating evidence was "strong," there was still no reasonable probability that it would have "tipped the

---

[2]*See Cohn v. State*, 849 S.W.2d 817, 819–20 (Tex. Crim. App. 1993) (defining "bolstering" as "any evidence the *sole* purpose of which is to convince the factfinder that a particular witness or source of evidence is worthy of credit, without substantively contributing 'to make the existence of [a] fact that is of consequence to the determination of the action more or less probable than it would be without the evidence'"). Indeed, Greene argues that expert testimony and documentary evidence would have "corroborated the defense testimony and increased the credibility of [Greene] and his witnesses."

scale in [defendant's] favor"); *Parker*, 462 S.W.3d at 565 (similar); *see also Ex parte West*, No. WR-78,439-02, 2016 WL 9000801, at *14 (Tex. Crim. App. June 8, 2016) (not designated for publication) (holding that defendant had not shown prejudice for failure to call witnesses to provide mitigation testimony because cross-examination could have revealed harmful information).

Third, the aggravating evidence against Greene was particularly compelling. In addition to the evidence of Greene's voluntary intoxication, the jury heard the horrific details of the attack, the store clerk's injuries, and her firsthand account of being stabbed in the neck with a knife. It viewed a video of the violent attack itself, with sound, and saw Greene's actions before and after he stabbed the store clerk. The jury heard testimony from multiple witnesses describing the physical, medical, and emotional trauma that the store clerk had endured and continued to endure because of Greene's actions, as well as her husband's trauma. The jury also received evidence of Greene's criminal history and heard his attempts to rationalize those incidents. And the jury heard testimony that Greene had failed to properly manage his mental illnesses in the past.

Even if the testimony of a mental health expert or documentary evidence of Greene's mental health history could have added more to the mitigation picture than counsel had already presented, we cannot conclude that it likely would have been compelling enough to change Greene's sentence. *See West*, 2016 WL 9000801, at *14 (reaching similar conclusion). The fact that expert testimony or documentary

18

evidence—again, assuming there had been any—might have bolstered the lay witness testimony is not significant enough to tip the scales in Greene's favor when weighed against all the evidence against him that supported a longer sentence. *See id.*; *cf. Wiggins*, 539 U.S. at 534–35, 537, 123 S. Ct. at 2542, 2543–44 (finding prejudice where mitigating evidence was "powerful" and relevant to assessing moral culpability and where defendant did not have a history of violent conduct that could have been used to offset powerful mitigating evidence).

Contrary to Greene's contention that the expert testimony and documentary evidence would have "allowed an informed jury to consider punishment in light of [his] history of mental illness," the record reflects that the jury did just that. It had been informed of Greene's mental health history through three different lay witnesses' testimonies. With that information—as well as the evidence that Greene had an eighteen-year-long methamphetamine habit and had been voluntarily intoxicated when he attacked the store clerk, that he had a criminal history consisting of both violent and non-violent offenses, and that he had never been diagnosed with Huntington's disease despite its being mentioned during defense testimony to somehow excuse his behavior—and having heard counsel's and Greene's family's pleas for mercy, the jury considered a punishment range of five to ninety-nine years or life in prison. Within that punishment range, the jury assessed Greene's punishment at fifty-five years.

We also reject Greene's notation that the State "pointed out the lack of corroborating evidence regarding [his] mental health." On cross-examination, the State asked Greene whether he had "br[ought] any documentation" for his commitment to the state hospital or for his diagnoses—two questions out of approximately fifty-five pages of defense testimony in the record. In its rebuttal argument, the State asserted that Greene had not "br[ought] any evidence of" his mental illness—one sentence out of approximately nine pages of closing argument in the record. We cannot say whether this effectively swayed the jury, particularly when the rest of the State's argument emphasized Greene's voluntary intoxication, arguing, "[W]e are not here because [Greene] was off of his medication. . . . [W]e are here . . . because [he] decided not to take his medication or get more medication[] but instead[] decided to smoke meth for two weeks straight." The State also appeared to concede that Greene had a mental illness, arguing that having a mental illness does not excuse his stabbing someone in the neck. The State urged the jury to think about the store clerk and to hold Greene accountable for his voluntary actions. The jury clearly did so.

On this record, we cannot say that the jury would have assessed a different punishment if it had heard the testimony of a mental health expert or had received documentary evidence of Greene's mental health history, and Greene has not shown otherwise.

We overrule Greene's sole point of error.

20

## IV. Conclusion

Having overruled Greene's sole point of error, we affirm the trial court's judgment.

/s/ Wade Birdwell

Wade Birdwell
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: March 13, 2025