

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

---

No. 07-24-00085-CR

---

### JOSHUA DANIEL BRUMBALOW, APPELLANT

### V.

### THE STATE OF TEXAS, APPELLEE

---

On Appeal from the 108th District Court
Potter County, Texas
Trial Court No. 079464-E-CR, Honorable Douglas R. Woodburn, Presiding

---

May 20, 2025

## MEMORANDUM OPINION

### Before PARKER and DOSS and YARBROUGH, JJ.

Appellant, Joshua Daniel Brumbalow, was convicted of continuous sexual abuse[1] of his daughter, H.R., who was under the age of fourteen at the time.[2] The jury assessed a sentence of 75 years of confinement. Appellant raises five issues on appeal: three

---

[1] *See* TEX. PENAL CODE ANN. § 21.02(b), (c), (h) (a first-degree felony).

[2] To protect H.R.'s privacy, we identify H.R. and her mother by their initials. *See* TEX. CONST. art. 1, § 30(a)(1) (granting victims of crime "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process.").

claims of ineffective assistance of counsel, a claim of jury charge error, and a challenge to court-appointed attorney fees in the bill of costs. We affirm the judgment as modified.

## Background

In July 2020, Appellant was indicted for committing two or more acts of sexual abuse against H.R., a child younger than seventeen, over a period exceeding thirty days from August 2011 through June 2020. The indictment alleged Appellant touched H.R.'s genitals with his hand to arouse or gratify his sexual desire, penetrated her sexual organ with his finger, penetrated her sexual organ with his sexual organ, and penetrated her anus with his sexual organ.

At trial, H.R. testified that Appellant sexually abused her while her mother was at work. The abuse began when she was six or seven years old. According to testimony, H.R. would ask for snacks, and Appellant would respond that she had to "do whatever he wanted to do." According to H.R., the statement really meant she would have to go to his bedroom and allow him to touch her breasts and vagina.[3] When she was eight or nine, Appellant began penetrating her vagina with his finger.

H.R. testified that when she was between the ages of ten to thirteen, the abuse continued. She recalled asking Appellant for softball equipment for camp, to which he responded, "you can have it if—you let me do what I want." He pushed her onto his bed, removed her clothes and his own, and penetrated her vagina with his penis. On other occasions, he penetrated her anus with his penis. H.R. estimated this abuse occurred "more than twenty times but less than fifty." She recalled Appellant ejaculating on her

---

[3] H.R. testified this occurred so many times that she "thought it was normal."

2

stomach and back. When her sister knocked on the door during these occasions, Appellant would tell her to go away.

Felicia Manning, a sexual assault nurse examiner, conducted a medical assessment of H.R. in 2020, and noted healed tears to the child's hymen. When asked what might have caused such damage, Manning responded, "[w]ell, according to her history, she mentioned a penis."[4] Manning testified she was unable to determine the age of these injuries. As part of her medical assessment, Manning interviewed H.R. and documented additional disclosures. Manning testified that during an assessment, H.R. disclosed that when she was twelve years old, Appellant twice performed oral sex on her. H.R. also revealed to Manning that Appellant told her to "keep it our little secret" and said he "only wanted" her.

The State also introduced H.R.'s 2020 Bridge interview conducted by forensic interviewer Ashley Anderle. This video further corroborated H.R.'s trial testimony with additional details. During this interview, H.R. told Anderle that Appellant masturbated before penetrating her during the softball-gear incident and told her "she was the only one because her body was perfect."

Additional testimony corroborated H.R.'s account. Officer Christina Harrison testified that in June 2020, she reviewed text messages between H.R.'s friend, Holly, and H.R.'s mother. Holly disclosed that H.R. had told her about Appellant's sexual abuse and also mentioned prior abuse by H.R.'s paternal grandfather.

---

[4] On cross-examination, Manning testified that H.R. might have acquired the scars through "some sort of trauma, a penetrative trauma." She also testified there was no sign of any injury to her anus.

Sergeant Devin Cantwell interviewed Appellant in June 2020. Appellant admitted being alone with H.R. in his room and not allowing her sister inside. When asked why H.R. might make an outcry of this type, Appellant suggested that "if something did happen, it must have been an accident and happened during a wrestling time."

Lee Ann Lefevre, H.R.'s counselor, testified that after thirty sessions over two years, she diagnosed H.R. with PTSD, anxiety, and depression. During cross-examination, defense counsel questioned whether children sometimes fabricate abuse allegations in custody disputes. Lefevre responded that false reports typically deteriorate under scrutiny or change over time—patterns she never observed in H.R.'s case. She further testified that in August 2022, H.R. reacted "[n]egatively" and was "[v]ery upset" when her mother's new boyfriend and his father moved into their home.

Appellant's defense strategy largely centered on drawing parallels between H.R.'s allegations and a 2012 case involving her paternal grandfather. Sergeant Wes Lang testified about similarities between H.R.'s current allegations and those made in 2012, when H.R.'s older sister (age seven) was interviewed at The Bridge. Lang detailed how both cases involved delayed outcries and similar patterns: the abuser offered incentives or "bribed them," pushed victims onto beds by their shoulders, and committed abuse "in the alleged suspect's bedroom usually while they were watching TV or engaged in some other activity." More significantly, Lang testified that both cases followed a nearly identical progression: beginning with touching at ages five to seven, advancing to digital penetration around age eleven, and culminating in sexual intercourse when the victims reached ages twelve to thirteen. Lang testified to what he called a "commonality"—two girls living in the same household reporting very similar patterns of abuse. When the

4

prosecutor suggested an alternative explanation—that sometimes "an alleged pedophile and their alleged pedophile son or daughter continues that lineage"—Lang agreed with this possibility. However, he could not provide information about how frequently such intergenerational patterns of similar abuse occur.

Appellant testified he was unaware of the 2012 allegations against his father, though he confirmed his father saw H.R. three or four times weekly between ages five and thirteen. He noted that H.R.'s younger sister A.B., age ten in 2020, had never made any outcry. Appellant denied sexually abusing H.R. or causing her hymenal injury, and suggested H.R. was upset with him because he disapproved of her sexual orientation and because of tensions surrounding her parents' impending divorce.

In closing arguments, defense counsel emphasized the parallels between H.R.'s older sister's 2012 allegations against their grandfather and H.R.'s current allegations against Appellant: "They both have been Bridged. They both had delayed outcries. Both claimed digital touching. Both claimed intercourse starting at the age of about 13." The State responded by highlighting H.R.'s consistent testimony throughout the proceedings that it was Appellant, not her grandfather, who sexually abused her from ages five or six through thirteen. The prosecutor emphasized that H.R. had maintained this account through multiple interviews, medical examinations, and direct testimony at trial.

**Analysis**

Issue One:  Alleged Failure to Investigate Alternative Perpetrator

In his first issue, Appellant argues that pretrial investigation constitutes a "critical stage" of criminal proceedings under the Sixth Amendment, and that trial counsel's failure to investigate adequately constituted constructive denial of counsel requiring no showing

of prejudice, per *United States v. Cronic*, 466 U.S. 648 (1984).  Specifically, Appellant claims his attorney was ineffective by failing to adequately investigate Appellant's sister-in-law's boyfriend (who was later convicted of indecency with another child and who lived in Appellant's household when H.R. was an infant) and for not hiring an investigator to interview family members about potential defenses.[5]

Ordinarily, a defendant claiming ineffective assistance of counsel must prove both deficient performance and resulting prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).  *See also Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986) (adopting *Strickland* standard for claims under Texas Constitution).  However, in certain circumstances involving complete denial of counsel or government interference with representation, prejudice is presumed.  *Lake v. State*, 532 S.W.3d 408, 414 (Tex. Crim. App. 2017) (plurality op.).  Appellant contends such a situation is present here.

We disagree.  The Supreme Court specifically addressed defense counsel's duty to investigate in *Strickland*, when the defendant claimed counsel's investigation and presentation of mitigating evidence was inadequate.  The Court recognized that practical constraints often force defense attorneys to make strategic choices with limited information, noting that such decisions are "often based solely on conversations with the defendant and a review of the prosecution's evidence."  *Id.* at 681.  These strategic choices deserve deference proportionate to the reasonableness of the professional

---

[5] The record contains no evidence of any conduct between the boyfriend and H.R. during the relevant period.  In an affidavit attached to Appellant's motion for new trial, the sister-in-law averred that "[m]aybe [the boyfriend] didn't do anything . . . I don't know.  But I don't understand why he wasn't at least questioned."

judgment underlying them, considering factors such as the attorney's experience, whether pursued and unpursued defenses were compatible, and the potential drawbacks of alternative strategies. *Id.*

Investigation, of course, is the precursor to trial strategy. It follows logically that if strategic choices about the evidence presented at trial are subject to a prejudice analysis under *Strickland*, then the investigative decisions that necessarily inform those choices should be evaluated under the same framework.[6] To hold otherwise would create an irreconcilable inconsistency in Sixth Amendment jurisprudence. The Court specifically directed that "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. Such guidance would be rendered meaningless if we divorced the analysis of counsel's investigative decisions from their potential impact on the case's outcome.

Moreover, accepting Appellant's position would lead to absurd results. It would transform unpursued leads into potential constitutional violations without the need to show an investigation would have yielded evidence helpful to the defense. The approach would effectively circumvent not only *Strickland's* analytical framework but also its express instructions. Adopting Appellant's proposed rule would also create perverse incentives in the attorney-client relationship. If we were to hold that the mere failure to investigate certain leads automatically constitutes a Sixth Amendment violation without requiring a showing of prejudice, we would effectively incentivize defendants to withhold potentially

---

[6] "A claim for ineffective assistance based on trial counsel's failure to investigate generally fails absent a showing of what the investigation would have revealed that reasonably could have changed the result of the case." *Guillory v. State*, 652 S.W.3d 499, 505 (Tex. App.—Houston [14th Dist.] 2022, no pet.).

helpful information from their attorneys. A defendant could strategically refrain from disclosing potential leads, knowing that counsel's failure to independently discover and pursue those leads—regardless of their actual merit—would provide an easier path than *Strickland* to obtain a new trial if convicted. Such a rule would undermine, rather than enhance, the effective assistance of counsel that the Sixth Amendment is designed to protect.

We do not find that counsel's allegedly deficient performance violated Appellant's Sixth Amendment right to counsel. The record demonstrates counsel actively participated throughout trial by vigorously cross-examining witnesses, developed a coherent alternative-perpetrator theory focused on Appellant's father, and presented closing arguments that methodically highlighted the similarities between allegations against the father and current allegations against Appellant. This performance subjected the prosecution's case to meaningful adversarial testing as required under *Strickland*.

The record does not demonstrate how counsel's alleged failure to further investigate caused prejudice to Appellant beyond mere conjecture and speculation. *See Holbert v. State*, 665 S.W.3d 120, 126 (Tex. App.—Amarillo 2023, pet. ref'd). In his motion for new trial, the sister-in-law's affidavit undermines rather than supports Appellant's claim, acknowledging, "Maybe [boyfriend] didn't do anything . . . I don't know." Appellant failed to establish what his sister-in-law's boyfriend or other family members would have said if interviewed or how such testimony would have contributed in light of the potentially conflicting evidence that Appellant's own father was the perpetrator. *See Strickland*, 466 U.S. at 681 (including "the inconsistency of unpursued and pursued lines of defense" among factors relevant to determining whether counsel's strategic choices

8

are reasonable).  This speculative showing falls far short of establishing the "reasonable probability" of a different result required by *Strickland*.  *See Ex parte Martinez*, 195 S.W.3d 713, 730 (Tex. Crim. App. 2006) (requiring defendant to show what further investigation would have revealed and how it would have changed trial outcome).  *Guillory*, 652 S.W.3d at 505.

We find Appellant has failed to show his counsel rendered an unconstitutionally deficient performance in failing to investigate the boyfriend as a potential perpetrator of the alleged offense.

Issue Two:  Equal Protection

Appellant next argues that reviewing ineffective assistance claims under different procedural standards violates his rights under the Equal Protection Clause to the United States Constitution.[7]  As we read his argument, Appellant contends that defendants raising these claims through motions for new trial face a higher burden than those using processes, such as habeas corpus applications.

We reject Appellant's argument for several reasons.  An Equal Protection claim requires the party to show (1) he was treated differently than other similarly-situated parties and (2) there is no rational basis for the difference.  *Downs v. State*, 244 S.W.3d 511, 518 (Tex. App.—Fort Worth 2007, pet. ref'd).  As an intermediate appellate court, we must follow the standards established by the United States Supreme Court and Court of Criminal Appeals.  Even if there were meaningful distinctions between these procedural

---

[7] *See* U.S. CONST., amend XIV, § 1.  The principle of equal protection guarantees that all persons similarly situated should be treated alike.  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3253–54, 87 L. Ed .2d 313 (1985).

routes, we lack authority to declare them unconstitutional. *See* U.S. CONST. art. VI; *Lockyard v. State*, 364 S.W.3d 920, 924-925 (Tex. App.—Amarillo 2012, no pet.).

Moreover, the standards are functionally identical. When reviewing alleged ineffective assistance from a motion for new trial or by a habeas petition, appellate courts defer to the trial court's factual findings supported by the record and review legal questions de novo. *See Ex parte Garza*, 620 S.W.3d 801, 808 (Tex. Crim. App. 2021) (review of habeas corpus petition); *Riley v. State*, 378 S.W.3d 453, 457 (Tex. Crim. App. 2012), *overruled on other grounds by Miller v. State*, 548 S.W.3d 497 (Tex. Crim. App. 2018) (review by direct appeal following motion for new trial).[8] Even when no motion for new trial is brought, scrutiny of counsel's performance "must be highly deferential." *Mata v. State*, 226 S.W.3d 425, 428 (Tex. Crim. App. 2007). Because the standard of which Appellant complains is essentially the same, there is no equal protection concern.

Finally, even if procedural differences exist between reviewing ineffective assistance claims in new trial motions versus habeas proceedings, any such distinctions rest on legitimate timing constraints. New trial motions must be filed within thirty days, severely limiting factual development. As the Court of Criminal Appeals recognized in *Mata*, direct appeal records are "usually undeveloped and inadequately reflective of the reasons for defense counsel's actions at trial." 226 S.W.3d at 430. Compounding this problem, defendants often cannot even identify ineffective assistance when it occurs. As explained in *Randle v. State*, "because many errors by defense counsel are of a technical

---

[8] *See also Holbert v. State*, 665 S.W.3d 120, 125 (Tex. App.—Amarillo 2023)*, cert. denied*, 144 S. Ct. 294, 217 L. Ed. 2d 135 (2023) (case cited by Appellant as evidence of an Equal Protection Clause violation. There, this Court held that trial court did not abuse its discretion in denying motion for new trial when evidence was too speculative as to what obtaining a continuance would have accomplished).

nature, the defendant may not even know errors by their trial lawyer are occurring, and cannot possibly object." 847 S.W.2d 576, 580 (Tex. Crim. App. 1993). These obstacles—combined with defendants' understandable reluctance to alienate counsel during trial[9]—help to explain why new trial motions frequently lack the information necessary to properly evaluate counsel's performance.

These realities justify heightened deference to trial courts as practical necessity, not an arbitrary preference. Unlike appellate courts reviewing cold records, trial judges recently witnessed counsel's actual performance and can assess strategic decisions that may not be apparent from the record alone. Such temporal constraints provide a rational basis for procedural variations in reviewing ineffective assistance claims. Appellant has not shown these distinctions lack a rational connection to legitimate state interests. *See Smith v. State*, 898 S.W.2d 838, 847 (Tex.Crim.App.1995) (complaining party must show the different classification "is not rationally related to a legitimate state interest where interests other than fundamental rights or suspect classification are affected"). We reject Appellant's Equal Protection claim.

Embedded into his ineffective assistance claim is an argument that trial counsel was ineffective for failing to investigate that a divorce between Appellant and his wife "was brewing" at the time of H.R.'s outcry and that H.R. wanted to live with her mother rather than Appellant. Appellant suggests this investigation might have revealed a "possible defense." Appellant also identifies another potential for H.R.'s bias: Appellant disagreed with her sexual orientation.

---

[9] *Id.* ("We do not require any defendant to risk alienating his trial lawyer by requiring the defendant to claim ineffective assistance of counsel at the time of trial.")

Appellant's argument about what trial counsel might have been able to discover with further investigatory diligence fails to demonstrate *Strickland's* prejudice element "beyond mere conjecture and speculation." *See Holbert v. State*, 665 S.W.3d at 505. The record reveals counsel attempted to develop witness testimony, and Appellant provided names of family members. However, those witnesses never appeared at trial where counsel intended to interview them. As we have held, a client "has the reciprocal obligation to reveal facts known to him before counsel may be considered ineffective for not uncovering or investigating them." *Ayers v. State*, No. 07-96-0206-CR, 1997 Tex. App. LEXIS 1934, at *12-13 (Tex. App.—Amarillo Apr. 11, 1997, no pet.). Appellant cannot now claim harm from counsel's failure to independently discover information that Appellant himself failed to provide or facilitate.

Moreover, Appellant testified at trial about the very issues he now claims counsel should have investigated. He told the jury that H.R. was "pretty upset with him" because he disapproved of her sexual orientation while her mother was supportive. He also testified about discussing the potential divorce with H.R. Appellant offers nothing but surmise about how additional investigation on these topics could have changed the outcome. Appellant's second issue is overruled.

<u>Issue Four:  Failure to Object to Bridge Interview Video</u>

Appellant's next ineffective assistance claim challenges trial counsel's performance during the guilt-innocence phase. In his fourth issue, he contends counsel was deficient in failing to object to H.R.'s 2020 Bridge interview conducted by forensic interviewer Anderle. Appellant argues the video contained inadmissible hearsay and

included extraneous allegations not otherwise introduced at trial.[10]  When evaluating ineffective assistance claims based on failure to object, courts require appellants to demonstrate not only that an objection would have been sustained, but also that counsel lacked any reasonable strategic basis for the decision.  *Perez v. State*, No. 07-00-0454-CR, 2001 Tex. App. LEXIS 7441, at *11-12 (Tex. App.—Amarillo Nov. 6, 2001, pet. ref'd) (citing *Thompson v. State*, 9 S.W.3d 808, 813-14 (Tex. Crim. App. 1999)).

At the outset, we note that the allegedly extraneous statements must be evaluated against the extensive trial testimony already before the jury, which included graphic descriptions of continuous sexual abuse spanning years.  H.R. testified in detail about vaginal and anal penetration, oral sex, and inappropriate touching beginning when she was six years old.  Accordingly, much of the video's content is, at worst, cumulative of the evidence already presented.

However, assuming arguendo, that the video was inadmissible, the record reveals strategic reasons for counsel's decision not to object.  During cross-examination and closing argument, counsel used the recorded Bridge interview to challenge H.R.'s credibility.  First, counsel highlighted the contrast between H.R.'s demeanor during the interview and at trial.  The court reporter noted eight instances where H.R. became emotional during her trial testimony.  In closing argument, counsel reminded the jury that during the Bridge interview, she showed "not a tear, not emotional.  It was just, well, here we are."

---

[10] Appellant identifies several statements from the Bridge interview that allegedly were not presented through trial testimony, including claims that Appellant masturbated in front of H.R., descriptions of specific sexual positions during anal penetration, allegations of kissing her chest and thighs, attempted oral sex, possible filming in the bathroom, and comments about her body being "perfect."

13

Second, counsel used the video to expose an inconsistency in H.R.'s memory. After H.R. admitted her memory would have been better in 2020 than at trial, counsel demonstrated that her trial testimony included more details than her contemporaneous interview. In closing, counsel hammered this point:

> I want you to go back and look at that video and count how many times she says I don't know. One time she says it's just a blur. Well, this is not a blur, this is a court trial. This man's life is on the line.

Third, counsel used H.R.'s language choice in the interview to suggest she had been coached. During the interview, H.R. said her father "sexually assaulted me." Counsel suggested such sophisticated language revealed influence, asking the jury:

> What seventh grader goes to an unfamiliar place . . . she goes to The Bridge and the first words out of her mouth are my dad's sexually assaulting me. What 13-year-old even knows sexual assault. They may say my dad touches me; my dad hurts me. But just to say my dad sexually assaulted me; that doesn't make sense.

Had counsel successfully objected to the video's admission, he would have forfeited these impeachment opportunities. Admission of the video enabled counsel to mount a comprehensive attack on H.R.'s credibility through her demeanor, memory, and language. While this impeachment strategy ultimately failed to secure an acquittal, the decision to pursue it represents precisely the type of tactical judgment that *Strickland* protects from hindsight second-guessing. *See Thompson*, 9 S.W.3d at 314 (declining to find that representation was either effective or ineffective given lack of explanation in the record for failure to object to hearsay); *McKinney v. State*, 76 S.W.3d 463, 473-74 (Tex. App.—Houston [1st Dist.] 2002, no pet.) (discussing various reasons why criminal defense counsel might strategically decide not to object to inadmissible evidence). Accordingly, we cannot say on this record that counsel's performance was deficient

14

because he failed to object to the admission of the videotape of H.R.'s Bridge interview. Appellant's fourth issue is overruled.

Issue Three: Charge Error

Having addressed Appellant's ineffective assistance claims, we next consider his challenge to the trial court's jury charge. Appellant contends the jury charge was deficient in two respects: (1) it omitted a culpable mental state for continuous sexual abuse of a child and (2) it incorrectly defined "intentionally" and "knowingly" for aggravated sexual assault using result-of-conduct language rather than nature-of-conduct language. Because Appellant failed to object at trial, he can prevail only if he was "egregiously harmed" by an error in the charge. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

A trial court must instruct the jury on the "law applicable to the case." *See* TEX. CODE CRIM. PROC. ANN. art. 36.14; *Mendez v. State*, 545 S.W.3d 548, 552 (Tex. Crim. App. 2018). We review jury charge error in two steps: first, determining whether error exists and then evaluating whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017)*, superseded on other grounds by statute as stated in Velasquez v. State*, No. 03-19-00499-CR, 2021 Tex. App. LEXIS 5463, at *15 n.5 (Tex. App.—Austin July 9, 2021, pet. ref'd) (mem. op., not designated for publication).

Appellant's first complaint—regarding an omitted reference to mental state—fails as a matter of law. Penal Code section 21.02 defines continuous sexual abuse of a child by reference to predicate offenses that already contain their own culpable mental states. An "act of sexual abuse" under that section means "any act that is a violation of one or

15

more of the [listed] penal laws," including aggravated sexual assault of a child and indecency with a child. TEX. PENAL CODE ANN. § 21.02(c). In this way, the continuous sexual abuse statute operates as an aggregation offense; it is unnecessary to "prescribe some additional mental state because its [criminalized act] is merely the repeated commission of acts already requiring culpable mental states." *Lane v. State*, 357 S.W.3d 770, 776 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). The trial court properly omitted what would have amounted to a redundant and legally unnecessary instruction.

Regarding Appellant's second complaint, we agree with Appellant that the abstract portion of the charge contained error. The trial court defined "intentionally" and "knowingly" using result-of-conduct language, focusing on whether the defendant desired or was aware of the "result" of his conduct.[11] However, aggravated sexual assault of a child is a nature-of-conduct offense, requiring definitions that focus on the nature of the defendant's conduct itself. *See Ramos v. State*, 636 S.W.3d 646, 656 (Tex. Crim. App. 2021). The State concedes the jury charge was erroneous.

Having concluded that the trial court erred, we must determine whether that error caused egregious harm. *See Almanza*, 686 S.W.2d at 171; *Fraser v. State*, 593 S.W.3d 883, 891 (Tex. App.—Amarillo 2019, pet. ref'd). The Court of Criminal Appeals requires that we evaluate four factors when assessing egregious harm: (1) the complete jury

---

[11] The trial court defined the mental state related to aggravated sexual assault as a "result-of-conduct" offense:

    (1) A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result;

    (2) A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

charge; (2) counsel's arguments; (3) the entire evidence, including contested issues and weight of probative evidence; and (4) any other relevant factors. *Almanza*, 686 S.W.2d at 171. Egregious harm exists when the error "created such harm that the appellant was deprived of a fair and impartial trial." *Gonzalez v. State*, 610 S.W.3d 22, 27 (Tex. Crim. App. 2020).

We find that the error in the jury charge did not cause egregious harm to the Appellant. First, examining the complete jury charge reveals a critical distinction. While the abstract portion contained the aforementioned erroneous definitions, the application paragraph—which actually authorizes conviction[12]—correctly instructed the jury. The application paragraph properly required the jury to find, for example, that Appellant "intentionally or knowingly caused his finger to penetrate" and "intentionally or knowingly caused his sexual organ to penetrate" the victim. This distinction matters because "[w]here the application paragraph correctly instructs the jury, an error in the abstract instruction is not egregious." *Medina v. State*, 7 S.W.3d 633, 640 (Tex. Crim. App. 1999) (en banc).

Second, neither counsel's arguments nor the evidence raised any issue about Appellant's alleged intent. The defense focused exclusively on denying the acts occurred rather than challenging Appellant's mental state. Appellant's arguments and evidence focused exclusively on alternative theories—fabrication, mistaken identity, or impossibility—rather than challenging whether Appellant acted intentionally. In other words, the jury faced a single question: did the alleged acts occur? Because no evidence

---

[12] *See Crenshaw v. State*, 378 S.W.3d 460, 466 (Tex. Crim. App. 2012).

17

suggested the acts occurred but were accidental or unintentional, the erroneous mental state definitions could not have influenced the verdict.

The fundamental question in egregious harm analysis is whether the error could have influenced the jury's verdict. *Almanza*, 686 S.W.2d at 172. For the reasons stated above, that possibility does not exist here. We find no egregious harm and overrule Appellant's third issue.

Issue Five:  Court-Appointed Attorney Fees

In his final issue, Appellant challenges court-appointed attorney fees assessed without evidence he could pay them. The trial court found Appellant indigent in July 2020, when appointing trial counsel and again in February 2024, when appointing appellate counsel. Despite these findings, an April 2024 modified bill of costs added $10,980 in attorney fees, though immediately crediting the same amount back, leaving the total unchanged at $460.

Article 26.04(p) of the Code of Criminal Procedure provides: "A defendant who is determined by the court to be indigent is presumed to remain indigent for the remainder of the proceedings in the case unless a material change in the defendant's financial circumstances occurs." TEX. CODE CRIM. PROC. ANN. art. 26.04. Here, there is no evidence of changed circumstances between Appellant's initial indigency determination and the modified bill of costs. Indeed, the trial court's February 2024 finding of indigency for appellate purposes confirms Appellant's continuing inability to pay.

When trial courts assess attorney fees against indigent defendants without evidence of ability to pay, the remedy is modification of the judgment and bill of costs to delete those fees rather than remand to the trial court. *Woodard v. State*, No. 07-23-

18

00377-CR, 2024 Tex. App. LEXIS 4642, at *9 (Tex. App.—Amarillo July 2, 2024, pet. ref'd) (mem. op., not designated for publication) (collecting cases therein). Accordingly, we modify the judgment by deleting the modified Bill of Cost dated April 19, 2024, and reinstating the original Bill of Cost dated February 27, 2024.

## Conclusion

The trial court's judgment is modified by deleting the modified Bill of Cost dated April 19, 2024, and reinstating the original Bill of Cost dated February 27, 2024. In all other respects, the judgment is affirmed.

Lawrence M. Doss
Justice

Do not publish.